MAX N. TOBIAS, JR., Judge.
hThe defendant, Keyon D. Watkins, was convicted of possessing a firearm after having been previously convicted of a felony and resisting an officer. Finding no patent errors requiring any action by this court or any merit to the defendant’s assignments of error, but finding that the trial court erred in failing to adjudicate the defendant a fourth-felony habitual offender, we affirm the defendant’s convictions and sentences, but remand the case to the trial court with directions to vacate the defendant’s original sentence on Count 1 and resentence him as a fourth-felony habitual offender.
I.
A.
STATEMENT OF THE CASE AND FACTS
Keyon D. Watkins was charged by bill of information on March 5, 2012, in Count 1 with possession of a firearm, having been previously convicted of a felony (simple burglary), a violation of La. R.S. 14:95.1, and in Count 2 with resisting an officer, a violation of La. R.S. 14:108. Mr. Watkins entered not guilty pleas to both counts at *297 his 7 March 2012 arraignment. The trial court denied his motions to suppress the evidence and statements on 28 June 2012. He was tried on 9-10 |?October 2012, simultaneously by a twelve-person jury on Count 1 and by the court on Count 2, and found guilty as charged as to both counts.
On 18 January 2013, the trial court denied Mr. Watkins’ motions for new trial and post-verdict judgment of acquittal and sentenced him that same day to thirteen years at hard labor on Count 1 and six months in parish prison on Count 2, with the sentences to run concurrently. The trial court denied the defendant’s motion for reconsideration of sentence on that date.
A habitual offender hearing was held on 27 March 2012. The trial court took the matter under advisement and, on 9 April 2013, ruled that the state had failed to prove the defendant was a habitual offender. Mr. Watkins filed a motion for appeal that date, which the trial court granted.
On 2 July 2013, the state timely[1] filed a writ application for supervisory review in this court, seeking reversal of the trial court’s finding that it failed to prove that Mr. Watkins was a habitual offender. That writ application, bearing our docket number 2013-K-0931, was consolidated with the defendant’s appeal by an order of this court on 18 September 2013.
B.
Orleans Parish Probation and Parole Officer Summer Creekbaum testified that she supervised Mr. Watkins for a conviction for simple burglary. She identified the defendant in court and identified State Exhibit 1 as a fingerprint card with the defendant’s name and social security number thereon. She confirmed that |sthe card had a photograph on the back. Officer Creekbaum identified State Exhibit 2 as a copy of a document containing “conditions of good time supervision” that offenders sign when they are released on parole supervision. She read condition number ten, which states that “I shall not have in my possession or control any firearms or dangerous weapons.” Officer Creekbaum stated that Mr. Watkins signed S-2, and S-l and S-2 were kept in her file as part of her supervision of him.
Officer Creekbaum confirmed that she had supervised Mr. Watkins for at least one year. She further confirmed that she had conducted home visits at his residence during that time, and that at no point had she found him in possession of a firearm. To her knowledge the defendant was not associating with people who had firearms.
On Mardi Gras day, 21 February 2012, New Orleans Police Department (“NOPD”) Officer Cedric Davillier was assigned to duty on St. Charles Avenue in New Orleans, between Seventh and Eighth Streets. He testified that around 4:30 p.m. the crowd had begun to dissipate, but the sun was still out and the lighting was very good. As he stood near the sidewalk on the lake side corner of St. Charles Avenue and Eighth Street, he was paying attention to several males loitering in that area. He observed the defendant approach, and he noted that the left front pocket of the defendant’s blue jeans appeared to be weighed down with an object, causing that side of his pants to hang lower than the right side. Officer Davillier testified that as he continued to observe the defendant, he detected what he be *298 lieved to be the distinct impression of a firearm in the defendant’s front pocket.
Officer Davillier testified that because of the crowd he was reluctant to deal with a person with a firearm by himself. He first unsuccessfully attempted to Rnotify some other units via his police radio, then used his cell phone to call another officer who was with several other officers at a nearby location. Officer Davillier stated that as Officer Glenn Buckel and a couple of other police officers approached him, he noticed that the defendant became a little nervous. Mr. Watkins then began walking from St. Charles Avenue onto the sidewalk and Eighth Street. After consulting with Officer Buckel, the two fully uniformed officers decided to conduct an investigatory stop of the defendant to determine whether he was carrying a firearm.
As the defendant walked away alone on the sidewalk down Eighth Street, he looked back over both his right and left shoulder. Officer Davillier testified that the defendant then began to run down Eighth Street toward Carondelet Street. Officer Davillier stated that Officer Buckel pursued the defendant on the sidewalk, and he himself ran down the middle of the street. The defendant turned left onto Carondelet Street, headed towards Harmony Street. He lost sight of the defendant both when the defendant turned left from Eighth Street onto Carondelet Street and when the defendant turned left from Carondelet Street onto Harmony Street. Officer Davillier testified that when he turned from Carondelet Street onto Harmony Street, he observed Mr. Watkins lying on his stomach with his hands up, as Officer Buckel attempted to handcuff him. Officer Buckel was looking back at an automobile parked at the corner of Harmony and Carondelet Streets. Officer Davillier located a firearm underneath the automobile, dragging it out with his expanded baton. Officer Davillier replied in the negative when asked whether he was wearing gloves when he picked up the gun and handed it to Officer Buckel. Officer Davil-lier identified State Exhibit 3 as a High Point 9mm handgun he |srecovered from underneath the car that day, as well as a magazine and cartridges from that firearm. Officer Davillier identified Mr. Watkins in court.
Officer Davillier replied in the negative when asked on direct examination by the state whether: (1) at the time the officers began approaching the defendant, he was still among the group of four or five other black males; (2) at the time the defendant began running (up Eighth Street), the officer was chasing anyone else; (3) when he was running up Carondelet Street to Harmony Street, he was chasing any other black males besides the defendant; or (4) when he turned from Carondelet Street onto Harmony Street, he was chasing any other black males.
Officer Davillier confirmed on cross examination that he lost sight of Officer Buckel both when Officer Buckel turned from Eighth Street onto Carondelet Street and when Officer Buckel turned from Car-ondelet Street onto Harmony Street.
NOPD Officer Glenn Buckel was working on Mardi Gras day 2012 on the lake side of St. Charles Avenue near Toledano Street, when Officer Davillier asked for assistance with a group of subjects possibly armed with a firearm. He relocated to the 3000 block of St. Charles Avenue, near its intersection of Eighth Street, where he observed the defendant. He stated that after speaking with Officer Davillier, he decided to approach the defendant to confirm whether or not he had a firearm on his person. Officer Buckel stated that as he proceeded toward the defendant, the defendant turned and began walking away down Eighth Street toward Carondelet *299 Street. He testified that the defendant observed the police presence. Officer Buckel followed the defendant, walking approximately ten to fifteen feet behind him. He said the defendant continuously looked over his shoulders to, in Officer Buckel’s opinion, check to see where the officers were.
| ^Officer Buckel stated that at about mid-block on Eighth Street, the defendant turned around. He said that at that point he nodded his head and attempted to talk to the defendant, at which point the defendant grabbed his pants (apparently to hold them up) and ran. Officer Buckel pursued him, calling out commands for him to stop. The defendant ignored those commands and ran around the corner, turning left onto Carondelet Street. The officer testified that, as he got to the corner of Caron-delet and Harmony Streets, he observed the defendant remove a firearm and continue running with it in his left hand. The defendant then turned from Carondelet Street onto Harmony Street, back toward the parade route on St. Charles Avenue. When Officer Buckel got to the corner, he drew his service weapon and turned onto Harmony Street, whereupon he observed the defendant throw a firearm with his right hand underneath a red car. The officer later testified that he could hear the sound of the metal hitting the pavement.
The defendant attempted to flee, but tripped on some tree roots between the sidewalk and the street and fell, then got up again. Officer Buckel was able to catch up with the defendant in the 1600 block of Harmony Street. The defendant refused his command to lie on his stomach, so Officer Buckel holstered his weapon and physically took the defendant to his knees, physically resting on top of the defendant to try to get control of the defendant’s hands, all the while facing the car where the firearm had been discarded. Officer Buckel replied in the negative when asked whether he saw any other citizens near the red car or saw any citizens go underneath it. He said there had been some citizens coming from Carondelet Street to Harmony Street when he had his service weapon in his hand and was chasing the armed defendant. The officer said those individuals “kind of’ backed up and waited.
17Officer Buckel stated that after backup assistance arrived, including Officers Gau-det and Davillier, the defendant was handcuffed. He and Officer Davillier went back to the car underneath which Officer Davillier retrieved the firearm. Officer Buckel identified S-3 as the gun confiscated that date, as well as a magazine for the gun and cartridges that were contained therein. Officer Buckel confirmed that he was chasing the defendant and no one else, and that no one was ever running in the same direction as he and the defendant. After securing the defendant and retrieving the firearm, he advised Mr. Watkins of his rights and informed him that he was under arrest for possession of a firearm and resisting a police officer. The officers checked the defendant’s name and learned that he was on parole. Officer Buckel confirmed that subsequently the defendant was arrested for being a convicted felon in possession of a firearm. He said he asked the defendant why he had a gun; the defendant replied that people did not like him, explaining that they hated him and his style. Mr. Watkins never denied having the gun. When asked why he ran, Mr. Watkins said being in jail was like being dead and that he would rather be dead than be in jail. The defendant did not want to respond to further questions as to where he obtained the firearm, and at that point Officer Buckel stopped questioning him. Officer Buckel identified Mr. Watkins in court as the person he chased and arrested that day.
*300 When asked on direct examination by the state whether there was any other group with the defendant at the time the defendant initially began walking away, Officer Buckel replied that the defendant was by himself. Officer Buckel also replied in the negative when asked whether, at the time he decided to chase the defendant, there were any other black males running alongside of the defendant.
Officer Buckel confirmed on cross examination that when he testified |spreviously in the case, he had stated that the defendant had been standing on the river side of St. Charles Avenue. The officer said he had been mistaken in that earlier testimony, and that in fact Mr. Watkins had been on the lake side of St. Charles Avenue. The officer confirmed that when he saw the defendant standing on St. Charles Avenue, he did not see the imprint of a firearm in his left pocket. He confirmed that when he struggled with the defendant, he briefly lost sight of the gun. The officer said he personally took the firearm Officer Davillier recovered to NOPD Central Evidence and Property. Officer Buckel confirmed that the defendant knowingly and voluntarily made the statements to him after the officer advised him of his rights and that he wrote the police report.
On redirect examination, Officer Buckel identified State Exhibits 4 through 6 as photographs of the area of Harmony and Carondelet Streets where he chased the defendant and finally caught up with him.
NOPD Officer Steven Gaudet testified that he was on St. Charles Avenue on Mardi Gras day 2012 and proceeded to Eighth Street to assist Officer Buckel. Officer Gaudet said Officer Buckel was approximately one-half block in front of him on Eighth Street when the defendant started to run and Officer Buckel began pursuing him. Officer Gaudet followed, but lost sight of both the defendant and the officer until he turned onto Harmony Street from Carondelet Street, at which point he observed Officer Buckel on top of the defendant in the middle of the street. Officer Gaudet ran to assist Officer Buckel in the handcuffing. Officer Gaudet identified the defendant in court, and he stated that he remained with the defendant while Officer Buckel conducted the investigation. Officer Gaudet confirmed on cross examination that Officer Davillier arrived right behind him, as he was handcuffing the defendant. He further confirmed that he never saw the [ 9defendant with a gun. On redirect examination, Officer Gaudet replied in the negative when asked whether, when he began running, he was chasing after any other individuals or whether there were any other individuals running along with the defendant.
NOPD Officer George Jackson was qualified as an expert in the field of the examination, analysis, comparison, and evaluation of latent and inked fingerprints. He identified State Exhibit S-7 as a certified fingerprint card he brought with him to court, under the name of Keyon Watkins. Officer Jackson also identified State Exhibit S-8 as a fingerprint card containing a set of the defendant’s fingerprints that he took from the defendant in court that date. He identified State Exhibit S-9 as a certified packet containing a bill of information, a waiver of rights/plea of guilty form, a docket master entry, two minute entries, and an arrest register. Officer Jackson compared the set of fingerprints he took in court that day, State Exhibit 8, to the fingerprints on both State Exhibit S-7 and on State Exhibit S-l (the set of fingerprints from the defendant’s parole records), and concluded they were all from the same person. Officer Jackson testified that there were fingerprints on the back of a document in State Exhibit S-9, but that they were not suitable for identification.
*301 However, Officer Jackson linked up the certified pack records with the defendant through information on documents in the certified pack and a folder number on one of the sets of fingerprints he had already-matched to the defendant.
Retired NOPD Officer Nicholas Molli-gan, testifying on behalf of the defendant, was qualified by stipulation as an expert in the field of fingerprint collection, analysis, and identification. He received a handgun to analyze in this case from an investigator with the public defender’s office. He chemically Unprocessed it using a super glue vapor process, but was unable to find any identifiable fingerprints on the gun— or on its magazine and some live cartridges he also tested.
Officer Buckel, recalled as a witness by the defendant, testified that an “X” he placed on State Exhibit S-4, a photograph of the location on Harmony Street, was approximately where the parked vehicle under which the defendant threw the gun was located. He stated again that he heard the gun hit the concrete. When defense counsel characterized the ground at that location as being dirt and grass, Officer Buckel stated that it did not appear to be dirt and grass, but rather it appeared to be gravel with some form of concrete and a little bit of mud. Officer Buckel confirmed that he searched the defendant incidental to his arrest, but did not find a gun or bullets on his person. The officer did not recall finding a phone, lip balm, or parole card on the defendant’s person.
Eladio Valdez, an investigator for the Orleans Public Defender’s Office, testified that he took photographs as part of his investigation in the instant case. He identified those photos as Defense Exhibits 3 and 4, photos of the corner of Carondelet and Harmony Streets, and Defense Exhibit 5, a photo of the 1600 block of Harmony Street. After refreshing his recollection with Defense Exhibit 6, a property receipt, Mr. Valdez was asked what items were in the defendant’s property at Central Lockup. He replied that the property was a cell phone, an “I.D. card,” and some lip balm. Mr. Valdez admitted on cross examination by the state that the property receipt actually said “card,” not “I.D. card,” as he had testified to on direct examination. Mr. Valdez also admitted that the photos did not depict the area exactly as it was on 21 February 2012.
II.
J^ERRORS PATENT
A review of the record reveals two patent errors. First, the record does not reflect that the trial court waited twenty-four hours before sentencing Mr. Watkins after denying his motions for new trial and for post-verdict judgment of acquittal. See La. C.Cr.P. art. 873 (“If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled.”). Although La.C.Cr.P. art. 873 only refers to a twenty-four sentencing delay following the denial of motions for new trial and in arrest of judgment, this court has also held that the failure of a trial court to wait at least twenty-four hours before sentencing a defendant after denying a motion for post-verdict judgment of acquittal constitutes an error patent on the face of the record. State v. Green, 10-0791, pp. 19-20 (LaApp. 4 Cir. 9/28/11), 84 So.3d 573, 586; State v. Wilson, 526 So.2d 348, 350 (LaApp. 4th Cir. 1988).
However, this court has further held that the failure to observe the twenty-four-hour delay is harmless where the defendant does not complain of his sentence on appeal. State v. Duncan, 11-0563, p. 8 *302 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511; State v. Green, 10-1355, p. 12 (La.App. 4 Cir. 6/22/11), 69 So.3d 695, 703.
The defendant does not complain of his sentence on appeal in the instant case. Therefore, any error in failing to observe the twenty-four hour delay(s) is deemed harmless.
The second error patent is that the trial court’s sentence on Count 1, for the defendant’s conviction for possession of a firearm, having been previously convicted of simple burglary, was illegally lenient in two respects. The trial court sentenced the defendant to thirteen years at hard labor, a proper sentence of imprisonment from the sentencing range of not less than ten nor more than twenty 112years provided by La. R.S. 14:95.1 B. However, the trial court failed to stipulate that the sentence be served without the benefit of parole, probation, or suspension of sentence, and failed to impose a fine of “not less than one thousand dollars nor more than five thousand dollars,” both as provided for by La. R.S. 14:95.1 B.
Pursuant to La. R.S. 15:301.1 A, statutory restrictions such as a sentence be served without the benefit of parole, probation, or suspension of sentence are deemed to be contained in the sentence, whether or not imposed by the sentencing court, and the paragraph self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence resulting from the failure of the sentencing court to impose the restrictions. State v. Williams, 001725, p. 10 (La.11/28/01), 800 So.2d 790, 799; State v. Lindsey, 12-1195, p. 9 (La. App. 4 Cir. 11/20/13), 129 So.3d 759, 764-765.
However, the trial court’s failure to impose the mandatory fine provided for by La. R.S. 14:95.1 B would normally require that the case be remanded for the imposition of such fine. State v. Galle, 11-0930, p. 36 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 937, writs denied, 13-0752 (La.10/30/13), 124 So.3d 1102, 13-0561 (La.11/1/13), 124 So.3d 1107 (“No fine was imposed on either defendant, and this court holds that in such event, the case must be remanded for imposition of the fine.”), citing State v. Stephens, 09-0631, p. 10 (La.App. 4 Cir. 11/24/09), 27 So.3d 987, 993.
However, because the defendant is a fourth-felony habitual offender, as discussed infra, and this case must be remanded for sentencing as such, the trial court’s original sentence will necessarily have to be vacated by the trial court prior to sentencing defendant as a habitual offender. It would be a vain and useless act to require the trial court on remand to first impose the fine mandated by La. R.S. | ,ol4:95.1 B as part of the original sentence, only to have the trial court then vacate that entire original sentence in order to resentence defendant as a habitual offender. Therefore, the patent error involving the trial court’s failure to impose the mandatory fine on the defendant as part of his original sentence requires that we order no action by the trial court on remand.
III.
A.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, Mr. Watkins argues that the evidence was insufficient to sustain his conviction.
This court set forth the well-settled standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
*303 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319,1324 (La.1992).
|MIn addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The testimony of a single witness, if believed by the trier of fact, is in most cases sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
Mr. Watkins’ sufficiency argument is directed solely to the issue of whether he possessed a firearm. He makes no argument that the state failed to prove that the ten-year cleansing period provided for by La. R.S. 14:95.1 C had not elapsed at the time of the commission of the instant offense. Nor does he argue that the firearm at issue was not a “firearm” as defined by La. R.S. 14:95.1.
The defendant argues that there was no physical evidence to corroborate Officer Buckel’s claim that he had a gun. Mr. Watkins does not dispute that a gun, a magazine, and live cartridges were presented at trial and identified by Officer Buckel as those recovered from beneath the car where he had seen the defendant throw a gun — or that the defense had its expert, Mr. Molligan, analyze the gun, magazine, and some of the cartridges for fingerprints. He argues that Officer 11sBuckel’s claim that he saw the defendant throw the gun under the parked car was “illogical and inconsistent with the scene.” He reasons that Officer Buckel would have turned the corner from Carondelet Street onto Harmony Street too late to see him *304 throw a gun under a car if, as Officer Buckel testified, the defendant had turned that corner before Officer Buckel even reached Harmony Street, and Officer Buckel had slowed his pace a little bit before turning the corner. Mr. Watkins asserts that “[i]t is absurd to believe that, if [he] was leading in the foot race,” he “would have stopped and waited at the corner for the officer to catch up with him before tossing the gun away.” He argues that it is more believable that he simply ran past the parked car and that Officer Buckel eventually caught up with him at the spot where he apprehended him in the middle of the block. However, the defendant’s trial counsel offered that scenario in her closing argument at trial; the jury, weighing the credibility of Officer Buckel, obviously rejected that version of the events.
Mr. Watkins also cites to his trial counsel’s argument as to “what really happened” that day — that the defendant was walking down Eighth Street when he happened to notice several young men running in his direction with police officers chasing them. He tried to get out of the way by turning onto Carondelet Street. The defendant saw a young man with a gun run past him, so he made a quick turn onto Harmony Street; Officer Buckel mistook him for one of the men he was chasing, and followed him around the corner onto Harmony Street. When the officer saw the gun, which the actual perpetrator must have discarded, the officer decided to arrest the defendant for the offense because he knew the defendant was on probation.
| t (¡However, Officers Davillier, Buckel, and Gaudet all testified, or confirmed, that the defendant was the only person who was walking/running and being followed/chased by police that day. The jury chose to believe that the three officers were testifying truthfully.
Mr. Watkins also claims that another one of Officer Buckel’s assertions is inconsistent with the scene, that being that Officer Buckel claimed that when he saw the defendant toss the gun under the car he heard the sound of metal hitting concrete. The defendant inaccurately states that the location where Officer Buckel asserts the defendant allegedly threw the gun was covered in dirt and grass. When confronted with this allegation Officer Buckel, testified that it did not appear to be dirt and grass, but gravel with some form of concrete and a little bit of mud. The exhibits appear to depict what a rational trier of fact could conclude was a somewhat hard-packed, gravel and dirt surface, perhaps with some paving underneath, in the area adjacent to a very low curb. No grass is visible in that area in any of the photos. It would be reasonable to conclude that when the defendant tossed the handgun— of such weight to have caused his pants to noticeably droop/sag, as Officer Davillier testified — with such force that it traveled up underneath the car, it would have caused some noticeable type of sound as it landed/skidded on the somewhat hard-packed gravel and dirt surface.
Finally, Mr. Watkins argues that Officer Buckel’s testimony was “internally inconsistent” because “at first,” the officer testified that he had already discarded the firearm before he tripped over the tree roots. Officer Buckel did testify that the defendant threw the firearm underneath the car and then tried to flee, but fell on the tree roots. Mr. Watkins argues that Officer Buckel “then changed his testimony,’disclaiming that the defendant threw the firearm underneath the car at the same time he was falling. However, the record evidence does not bear this out. Further, Officer Buckel did not at any point in his testimony on either the first day or the second day, when he was re *305 called as a witness by the defense, state that the defendant threw the firearm underneath the car at the same time he was falling.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the defendant possessed a firearm as charged in the bill of information.
We find no merit to defendant’s sufficiency argument.
B.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error Mr. Watkins argues that the trial court “improperly and unfairly curtailed voir dire and thereby” violated his constitutional right to a full voir dire.
Following the conclusion of the challenge conference for the first venire panel, the trial court imposed a twenty-minute limit on each side for voir dire of the second venire panel. At the outset of the voir dire of the second venire panel the trial court thanked the prospective jurors and asked if they had paid close attention to what was happening during the voir dire of the first panel, to which the members of the panel gave affirmative responses. The panel members gave negative responses when subsequently asked whether there was any need to repeat all those questions in their entirety that had been asked during the voir dire of the first panel.
The state proceeded to complete its voir dire of the second panel, consisting of thirty prospective jurors, without incident. Defense counsel’s voir dire ended as | iscounsel was questioning the twelfth of the thirty prospective jurors about his views on guns, as follows:
THE COURT:
Your time is up, Counsel. You must close up.
MS. BELL:
If I may just ask a few more questions?
THE COURT:
Your time is up, Counsel. Be seated. MS. BELL:
Judge, may I approach?
THE COURT:
No, you may not. Be seated.
MS. LEPINGWELL:
Note our objection, Your Honor.
In State v. Holmes, 06-2988, p. 55 (La.12/2/08), 5 So.3d 42, 79-80, the Supreme Court set forth the applicable law for review of claims that a defendant’s right to voir dire was unconstitutionally limited:
La. Const, art. I, § 17 guarantees a defendant full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d 664, 668 (La.1993). Nonetheless, the scope of examination rests within the sound discretion of the trial court, and its ruling will not be disturbed absent clear abuse. La.Code Crim. Proc. art. 786; Hall, 616 So.2d at 669. In determining whether the trial court afforded a sufficiently wide latitude to the defendant, the entire voir dire examination must be considered. Id.
The defendant asserts on appeal that during the second voir dire his trial counsel asked reasonable questions and was not repetitious. The defendant correctly states that his trial counsel asked each prospective juror, in successive |19order (number *306 21 through 50), to state their occupation, their neighborhood, and what she/he liked to do in her/his free time. Defense counsel spent some extra time on this topic/subject questioning Juror number 34, a retired NOPD officer, as to whom defense counsel’s subsequent challenge for cause was denied. Defense counsel also spent some time questioning Juror number 33, an attorney who represented the Fraternal Order of Police and who admitted she would not be impartial. Defense counsel’s subsequent challenge for cause as to that prospective juror was granted by the trial court.
Also, immediately following defense counsel’s occupation/neighborhood line of voir dire, she questioned Juror number 26 concerning his earlier revelation that he was a neighbor of NOPD Officer Da-villier — the first witness to testify in the instant case, whose testimony was instrumental for the state. Defense counsel later challenged Juror number 26 for cause, but the challenge was denied.
Defense counsel next questioned Jurors number 39 and 40 concerning their answers during the state’s voir dire suggesting that they might hold the state to a higher burden of proof than proof beyond a reasonable doubt. Defense counsel next questioned Juror number 48 about having been robbed at gunpoint some four and one-half months earlier. Exhibiting a cognizance of her twenty-minute voir dire limitation, defense counsel stated that she wanted “to quickly go through prior jury service.” Counsel did quickly voir dire ten jurors with prior jury service.
Defense counsel then proceeded to ask the prospective jurors about their feelings about guns, speaking to only five jurors on this subject before the trial court advised her that her time was up. Defense counsel first addressed Juror number 21 on this subject, who was the first listed juror in the second venire panel, but the others, numbers 27, 26, 31, and 32, were addressed out of order, skipping Rnover numbers 22, 23, 24, 25, and then 28, 29, and 30. We note that during the voir dire of the first venire panel, composed of twenty prospective jurors, defense counsel directly questioned only eleven of them as to their views concerning guns. The trial court imposed no time limits on the duration of the voir dire of the first panel.
During the state’s voir dire of the second panel, the prosecutor asked if any of the prospective jurors had a “problem” with the law prohibiting felons from possessing firearms and questioned twenty of the thirty jurors on that issue, apparently randomly, as the voir dire transcript reflects that none had a “problem” with the law. The prosecutor subsequently asked whether there were any gun owners on the panel, asking them to hold their hands up so he could mark them. He then briefly asked each of the nine who presumably raised their hands whether she/he had any “problem” with the law as a gun owner— numbers 21, 26, 33, 34, 35, 42, 43, 50, and 47, in that order.
The state covered more topics during its voir dire of the second panel than did defense, covering, in addition to the two topics mentioned above as to La. R.S. 14:95.1 and gun owners’ views in particular, the subjects of whether any members of the panel were familiar with the facts of the case; knew any of the people involved in the prosecution; had any problem being able to judge police officer credibility; had been victims of gun crimes; had any problems with the standard of beyond a reasonable doubt; and whether they generally understood the concepts of actual versus constructive possession.
For the second panel, limited to twenty minutes per side, we calculate that the state and the defense each had available to *307 them an average of forty seconds R,per prospective juror to conduct voir dire.[2] Six jurors were seated from the first veni-re panel. The defense exercised eight peremptory challenges on the first venire panel. During the challenge conference from the second venire panel, the defense used four peremptory challenges, exhausting its allotted twelve.
The defendant cites State v. Strange, 619 So.2d 817 (La.App. 1st Cir.1993), where the court held that the trial court abused its discretion in imposing a ten-minute limit on each side for voir dire of three panels consisting of fourteen prospective jurors each, in what the appellate court characterized as a complex second degree murder case (the state called twenty-nine witnesses), resulting in prejudice to the defendant. The trial court initially conducted voir dire of the entire venire itself. Thereafter, it imposed the ten-minute limit. At the conclusion of voir dire the trial court noted that the defense had been allowed thirteen minutes to question the first panel, twelve minutes for the second panel, and eleven minutes for the third panel. Additionally, one juror on the third panel was questioned further outside the presence of the rest of the panel. The court found that, although the trial court had allowed defense counsel an average of two extra minutes per panel beyond the ten minute limit, counsel was not able to cover all the topics he intended to, and that on the third panel he was only able to question five of the prospective jurors concerning the defendant’s right not to testify/privilege against 122self-incrimination. Importantly, ten of the jurors were seated from the third venire panel.
Although the ten-minute limit per fourteen-member venire panel in Strange essentially equates to the twenty-minute limit for the thirty-member second venire panel in the instant case, we find the cases are distinguishable. First, unlike in Strange, a homicide case where the state presented twenty-nine witnesses, the instant case was relatively simple. In the instant case the state presented five witnesses, three of whom testified as to the only issue disputed by the defendant concerning the sufficiency of the evidence— whether he had been in possession of the gun recovered in the case. Secondly, six members of the jury were seated from the first venire panel where no time limitation was imposed. In Strange, the time limitation was in effect for all three venire panels. More importantly, apparently the only occasion defense counsel’s voir dire was stopped in Strange because of the time limitation was during the voir dire of the third panel, from which eight jurors and two alternates ultimately were seated.
In addition, in the instant case, the defendant had only four peremptory challenges left for the second venire, all of which he used. He also successfully moved to strike two prospective jurors from the second venire for cause, and he made strong arguments for cause strikes *308 of three other prospective jurors that were denied.
On an issue not considered by the appellate court in Strange, in the instant case the state covered subjects/topics during its voir dire of the second panel that were not covered by defense counsel. Thus, the defense had the benefit of this information when exercising its challenges.
123A trial court is given much discretion to limit voir dire as long as the defendant is not deprived of a reasonable opportunity to intelligently exercise challenges. State v. Lee, 559 So.2d 1310, 1316 (La.1990), citing State v. Duplessis, 457 So.2d 604 (La.1984).
Considering the entire voir dire examination, we do not find that the trial court’s time limitation resulted in defendant being deprived of a reasonable opportunity to intelligently exercise his challenges. Further, we do not find that the trial court abused its discretion and committed an error causing substantial prejudice to defendant, requiring this court to reverse his conviction and sentence.
We find no merit to this assignment of error.
IY.
THE STATES WRIT APPLICATION, 2013-K-0931
A.

The 2006 Conviction

Following the defendant’s October 2012 convictions, the state filed a bill of information charging Mr. Watkins as a fourth-felony habitual offender. A habitual offender hearing was held on 27 March 2013. In its 9 April 2013 ruling thereon, the court held that the state had failed to prove the defendant was a habitual offender. The state timely sought supervisory review of that decision, which this court, sua sponte, ordered that the writ application be consolidated with this instant appeal.
In its ruling, the trial court stated that the documents evidencing the defendant’s 2006 Texas conviction were deficient in that they did not contain a Boykin form or a minute entry reflecting the defendant’s waiver of constitutional rights, referring to the three rights articulated in Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 124(1969)(the right to trial by jury, the privilege against self-incrimination, and the right to confront one’s accusers). The court stated that it believed the Texas conviction “was also to be the linkage” for the two prior convictions alleged by the state, from 1999 and March 2002, meaning that the court believed the 2006 Texas conviction was necessary for the state to meet its burden of proving that the ten-year “cleansing period” for prior convictions provided by La. R.S. 15:529.1 C had not expired as to the 1999 and 2002 convictions. The trial court also stated that the Texas certified pack “does not contain a Boykin form or a minute entry reflecting the defendant’s waiver of rights,” and thus that the state failed to meet its burden.
We find the trial court erred in its application of the burden of proof necessary under La. R.S. 15:529.1 to use the 2006 Texas conviction to enhance defendant’s sentence.
Mr. Watkins does not dispute that he is the same person who pleaded guilty in the 2006 Texas case. The Texas certified pack of court documents from that case number F06-47647 included a document entitled “Judgment Certificate of Thumbprint.” This document contained what was labeled as an inked right thumb and four fingers of the right hand. New Orleans Police Department (“NOPD”) Officer Joseph Pol *309 lard testified at the habitual offender hearing that he took a set of the defendant’s fingerprints that day in court and compared the defendant’s right thumbprint he took in court to the right thumbprint of the “Keyana Watkins” on the Texas document and concluded they were the same person. That thumbprint on the Texas document contains the same case number and name as the other documents in the Texas certified pack.
The Texas certified pack in that case also contains a document entitled “Judgment of Conviction by Court-Waiver of Jury Trial.” The judgment of | ^conviction/waiver of jury trial form reflects that a judgment of conviction by plea of guilty was rendered on 22 September 2006. It lists the names of the presiding judge, the attorney for the state, the attorney for the defendant, and the criminal charge (theft of property valued at $1,500 or more, but less than $20,000, a violation of Texas Penal Code § 31.03).
At the bottom of the judgment of conviction/waiver of jury trial form are two check-off boxes, the first signifying that the defendant appeared in person with his counsel, the second signifying that the defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court and pleaded guilty. The first box is checked off in the defendant’s ease, evidencing that he appeared with counsel to plead guilty. The second box is not checked. In addition, the judgment of conviction/waiver of jury trial form contains a paragraph printed underneath the two check-off boxes. That portion of the form appears as formatted and quoted below:
Counsel/Waiver of Counsel (select one)
[X] Defendant appeared in person with Counsel.
□ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.
Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.
Under well-settled law set forth in State v. Shelton, 621 So.2d 769, 779-780 (La.1998):
|2filf the defendant denies the allegations of the [habitual offender] bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a “perfect” transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self-incrimination, and his right to confront his accusers. If the State introduces anything less than the “perfect” transcript, for example, a guilty plea form, a minute entry, an “imper- *310 feet” transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that the defendant’s prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boykin rights. [Footnotes omitted.]
In the case at bar, on the same day the state filed its habitual offender bill of information (18 January 2013), Mr. Watkins filed a response and objection thereto in which he disputed its allegations. He expressly asserted in part that he had not been advised of his rights at the time he entered the prior guilty plea, more specifically, that he had not been properly “Boykinized” at the hearings at which the pleas were entered. He also asserted that the state bore the burden of proving beyond a reasonable doubt that he was properly “Boykinized” and advised of his rights prior to entering those guilty pleas.
Under Shelton, the state initially was to prove the existence of the 2006 Texas guilty plea and that the defendant was represented by counsel when it was taken. Mr. Watkins does not dispute that the state met its initial burden under Shelton of proving the existence of the 2006 guilty plea and that he was |27represented by counsel when it was taken. The face of the Texas judgment of conviction/waiver of jury trial establishes these facts.[3]
The state contends that the burden thus shifted to the defendant to “produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea,” as per Shelton. The state argues further that Mr. Watkins failed to meet this burden, and thus the burden to prove the constitutionality of the plea never shifted back to the state.
Mr. Watkins argues that the Texas judgment of conviction, on its face, indicates that the trial judge did not determine whether Mr. Watkins’ plea was voluntary or admonish him of his rights, thus constituting affirmative evidence that he was not advised of his Boykin rights. However, this argument is premised on the defendant’s supposition that the paragraph below the two check-off boxes in the Texas judgment of conviction/waiver of jury trial form quoted hereinabove, reciting in part that the defendant waived the right of trial by jury and entered the plea indicated freely and voluntarily, is applicable only where the second box is checked off, signifying that the defendant waived the right to representation by counsel in writing in open court. Thus, defendant asserts, the face of that Texas document indicates that because he appeared in person with counsel, the Texas court did not determine whether the guilty plea was voluntary or “admonish” him as to his rights.
We do not read the document that way. First, the paragraph underneath the two check-off boxes is a new paragraph. It is not a continuation of the one full | ^sentence next to the waiver-of-counsel check-off box. The paragraph reciting that the defendant waived the right of trial by jury and entered the plea indicated above freely and voluntarily logically applies to the plea taken, regardless whether *311 or not he was represented by counsel at the taking of the plea.
All the first check-off box states is: “Defendant appeared in person with Counsel.” The only language in the judgment of conviction/waiver of jury trial form that recites that the defendant actually waived his right to a jury trial and that the court accepted the plea of guilty and entered it of record is the language contained in the one full paragraph. Even though defendant in the instant case was represented by counsel at that Texas proceeding, he still had to waive his right to trial by jury, and the trial court still had to accept the plea.
It is obvious from the face of the Texas judgment of conviction/waiver of jury trial form that the sole purpose of the two one sentence check-off boxes at the bottom of the form is to evidence that the defendant either was represented by counsel at the taking of the plea, or that he knowing, intelligently, and voluntarily waived the right to representation by counsel at the taking of the plea. The separate, full paragraph obviously is intended to reflect what is supposed to occur in the actual taking of the plea, to-wit, whether the defendant is represented by counsel or whether he has knowingly, intelligently, and voluntarily waived his right to counsel.
More importantly, the full paragraph in the counsel/waiver of counsel part of the form below the counsel/waiver of counsel check-off boxes recites, in part: “The Court then admonished Defendant as required by law.” This is a reference to | g9Texas Code of Criminal Procedure art. 26.13, which expressly requires that prior to accepting a plea of guilty the trial court “shall admonish the defendant of....”[4]
*312 IsnBoth the defendant and the state equate the admonishment referenced in the judgment of conviction/waiver of jury trial form in the instant case to the trial court advising defendant of his three Boykin rights. However, that is not necessarily the case, as “whether a trial court has complied with Article 26.13 and whether it has complied with Boykin are two separate issues.” Gardner v. State, 164 S.W.3d 393, 398 (Tex.Crim.App.2005).
Tex.C.Cr.P. art. 26.13 mandates such admonishment by the trial court before it accepts a guilty plea evidences that the paragraph on the judgment of conviction/waiver of jury trial form detailing that the court admonished the defendant, that it appeared to the court that the defendant made the plea freely and voluntarily and was aware of the consequences of the plea, et cetera, applies not just to when the defendant waives his right to counsel, but also to when he is represented by counsel. Thus, we find no merit to Mr. Watkins’ suggestion that the face of the judgment of conviction/waiver of jury trial form evidences that the trial court did not advise him of his rights in connection with the guilty plea.
In State v. Balsano, 09-0735 (La.6/19/09), 11 So.3d 475, the Court expressly held that for “all non-Louisiana guilty pleas [] used to enhance sentence following a subsequent conviction, a defendant does not satisfy his burden of proof on collateral attack merely by presenting contemporaneous records revealing” that he was not informed of and specifically waived his right to trial by jury, his privilege against self-incrimination, and/or his right to confront his accusers, the three rights articulated in Boykin and first adopted by the Court in State ex rel. | ai Jackson v. Henderson, 260 La. 90, 255 So.2d 85 (1971). Id., p. 3, 11 So.3d at 482. Rather, the Balsano court stated, a defendant “must show ... that his guilty plea was not voluntary as a constitutional matter, ie., that it did not represent a knowing and voluntary choice among available alternatives.” Id., pp. 3-4,11 So.3d at 482.
Balsano involved a defendant charged with operating a vehicle while intoxicated, fourth offense, on the basis of three prior guilty pleas to driving under the influence (“DUI”) from a single proceeding in Tennessee. The defendant moved to quash *313 the bill of information on grounds that the available contemporaneous records of the pleas — the transcript of the guilty plea colloquy conducted by the trial court with the defendant — revealed that the trial court failed to advise the defendant of his privilege against self-incrimination, and that the pleas were therefore invalid. The trial court denied the motion, finding that the defendant had been afforded all of the constitutional protections and safeguards required under the laws of Tennessee and Louisiana. The defendant sought review, and the court of appeal reversed, holding “that the state had failed to make an ‘independent, affirmative showing to support the proposition that the trial court informed the defendant of his right against self-incrimination.’ ” Id., pp. 1-2, 11 So.3d at 476.
On review, the Louisiana Supreme Court confirmed that “as the Fifth Circuit emphasized in its decision, the available contemporaneous records from Tennessee failed to establish that defendant received advice with respect to his privilege against self-incrimination at trial, advice required not only by Louisiana but also by Tennessee law.” Id., p. 4, 11 So.3d at 477. However, the Court noted that the Tennessee court had conducted an “extensive colloquy” with the defendant. That | ^colloquy reflected that the Tennessee court expressly advised the defendant of his right to trial by jury, his right to confront witnesses, his right to call witnesses to testify for him, and his right to appeal if convicted with an appellate attorney provided for him if he did not have one. The court also informed the defendant that the notice of enhanced punishment presented to him put him on notice that if he incurred another DUI conviction, it could be treated as a second or third DUI, and the punishment would be greater on a second offense. The defendant inquired what the maximum punishment would have been had he gone to trial, and the court informed him of the sentences and fines for first, second, and third offense DUI.
The Louisiana Supreme Court in Balsa-no concluded that, “[i]n the context of all the advice given, the trial court’s failure to mention specifically a fifth constitutional right, the privilege protecting a defendant from compelled self-incrimination at trial, cannot support a finding that defendant entered each of his guilty pleas without a full understanding of what the plea conno-tates and of its consequences.’ ” Id., p. 15, 11 So.3d at 484.
The Court in Balsano clearly stated that when an out-of-state conviction is being used to enhance a sentence for a conviction, a defendant does not satisfy his burden of proof on collateral attack merely by presenting contemporaneous records revealing that he did not waive his three Boykin rights, but rather, must show that his guilty plea was not voluntary as a constitutional matter, ie., that it did not represent a knowing and voluntary choice among available alternatives. While Bal-sano involved the enhancement of a DUI sentence based on prior DUI guilty plea convictions, the Court expressly referred to the use of guilty plea convictions to enhance sentences in habitual offender proceedings, treating them the same for purposes of its analysis.
133Under the Shelton three-step process as to habitual offender sentence enhancement (and the identical three-step process under State v. Carlos, 98-1366 (La.7/7/99) 738 So.2d 556, where the court applied Shelton to DWI sentence enhancement), the only “burden” spoken of as to the defendant prior to Balsano was the burden — shifted to the defendant upon the state presenting evidence of the fact of the prior guilty plea by the defendant (whether Louisiana or out-of-state conviction) and *314 that the defendant was represented by counsel at the taking of the plea — “to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea.” Shelton, 621 So.2d at 779. If the defendant met his burden, the burden then shifted to the state to prove “the constitutionality of the plea.” Id.
Logically, under Shelton (for habitual offender sentence enhancement) and Carlos (for DWI sentence enhancement), the three-step process when the prior guilty plea conviction is from out-of-state is: (1) The state has the initial burden of proving the fact of the defendant’s prior out-of-state guilty plea conviction and that the defendant was represented by counsel at the taking of the plea; (2) if the state meets this initial burden, the burden shifts to the defendant to show “that his guilty plea was not voluntary as a constitutional matter, ie., that it did not represent a knowing and voluntary choice among available alternatives” (Balsano, pp. 3-4, 11 So.Sd at 482); and, (3) if the defendant meets his burden, the burden shifts to the state to prove that the guilty plea was voluntary as a constitutional matter, ie., that it represented a knowing and voluntary choice among available alternatives, and was therefore valid for purposes of enhancing the defendant’s sentence. Id., pp. 34,11 So.3d at 482-483. See also State v. Morgan, 13-1495 (La.2/28/14), 134 So.3d 1160.
laJn the instant case, the Texas certified pack contains the previously discussed judgment of conviction/waiver of jury trial form, affirmatively stating that the defendant waived the right of trial by jury and entered the plea of guilty to the listed offense; that the court “then” “admonished” the defendant as required by law; that it appeared to the court that the defendant was mentally competent to stand trial, made the plea voluntarily, and was aware of the consequences of the plea; that the trial court received the plea and entered it of record; and that it found the defendant guilty and pronounced sentence. The sentence as reflected by the judgment of conviction/waiver of jury trial was two years in “state jail,” with the sentence of confinement suspended, and with defendant placed on “community supervision” for four years.
None of the Texas certified documents contains a specific reference to any of the three Boykin rights. However, under Shelton and Balsano, upon the state meeting its initial burden of establishing the fact of the guilty plea and that Mr. Watkins was represented by counsel at the plea, the burden shifted to the defendant to show that the guilty plea was not voluntary as a constitutional matter, meaning that it did not represent a knowing and voluntary choice among available alternatives.
In the case at bar, it is not disputed by Mr. Watkins that he entered the plea of guilty and that he was represented by counsel at the time. In fact, that he was represented by counsel at the time he entered the plea was an integral part of his argument directed to his incorrect supposition that the paragraph in the Texas judgment of conviction/waiver of jury trial form, reciting that he was admonished by the trial court and that he made the plea freely and voluntarily and was aware of [ 35the consequences of the plea, did not apply because the box was checked off signifying that he appeared with counsel.
Thus, the burden shifted to Mr. Watkins to show that his Texas guilty plea was not voluntary as a constitutional matter, meaning that it did not represent a knowing and voluntary choice among available alternatives. Mr. Watkins offered no evidence on this issue. Nothing in the Texas certified *315 pack establishes, or even suggests, that the defendant’s plea of guilty did not represent a knowing and voluntary choice among available alternatives. Thus, Mr. Watkins failed to meet his burden of proof, and the burden was not shifted back to the state to show that in fact the plea represented a knowing and voluntary choice among available alternatives. Therefore, the trial court erred in finding that the 2006 Texas conviction could not be used to adjudicate defendant a habitual offender.
B.

The 1999 and 2002 convictions

The trial court in this case effectively ruled that without the 2006 Texas conviction, the state could not establish that it had met its burden of proving that the ten-year “cleansing period” provided by La. R.S. 15:529.1 C had not expired as to the defendant’s 1999 and 2002 felony convictions listed by the state in the habitual offender bill of information. Completely aside from any issue relating to the 2006 Texas conviction, this ruling was erroneous.
La. R.S. 15:529.1 C states:
The current offense shall not be counted as, respectively, a second, third, fourth, or higher offense if more than ten years have elapsed between the date of the commission of the current offense or offenses and the expiration of the maximum sentence or sentences of the previous conviction or convictions, or between the expiration of the maximum sentence or sentences of each preceding conviction or convictions alleged in the | y,multiple offender bill and the date of the commission of the following offense or offenses. In computing the intervals of time as provided herein, any period of parole, probation, or incarceration by a person in a penal institution, "within or without the state, shall not be included in the computation of any of said ten-year periods between the expiration of the maximum sentence or sentences and the next succeeding offense or offenses.
The state bears the burden of proving that the prior/predicate conviction falls within the “cleansing period” prescribed by La. R.S. 15:529.1 C. State v. Tatten, 12-0443, p. 9 (La.App. 4 Cir. 5/1/13), 116 So.3d 843, 849, writ denied, 13-1236 (La.12/2/13), 126 So.3d 498. This ten-year “cleansing period” begins to run from the date that a defendant is actually discharged from state custody and supervision. State v. Anderson, 349 So.2d 311, 314 (La.1977); State v. Robinson, 11-0066, p. 13 (La.App. 4 Cir. 12/7/11), 81 So.3d 90, 97.
Even though the trial court appears to have based its ruling that the state failed to prove that the respective cleansing periods under La. R.S. 15:529.1 C had not expired as to the 2002 (case number 426-663) and 1999 (case number 409-424) convictions on its erroneous finding that the 2006 conviction could not be used to adjudicate the defendant a habitual offender, we find otherwise. The state met its burden of proving that the ten-year cleansing period as to the 2002 conviction had not elapsed at the time defendant committed the 2012 felony offense for which he was convicted in the instant case; and the ten-year cleansing period as to the 1999 conviction had not elapsed at the time defendant committed the felony offense for which he was convicted in the 2002 offense.
As to the 2002 prior conviction, the state charged that Mr. Watkins pleaded guilty as charged on 27 March 2002 to illegal possession of a stolen automobile valued at $500 or more. He was convicted in the instant case on 21 February 2012 |a7of the felony of having possessed a firearm, having been previously convicted of a simple *316 burglary. Mr. Watkins concedes in his appellate brief (possibly meaning only as to the 2002 conviction, such being not completely clear) that “[t]he State may be correct that the ten-year cleansing period had not elapsed.” Even without determining the defendant’s actual date of discharge from state custody for his 2002 conviction, given that he committed the felony offense for which he was convicted in the present case only nine years and eleven months after his conviction in the 2002 case, it is apparent that the ten-year cleansing period between that 2002 conviction in case number 426-663 and the commission of the instant 2012 felony offense had not expired. Thus, the trial court erred in finding that the cleansing period had expired as to the 2002 conviction.
Mr. Watkins was also charged in the habitual offender bill of information in the instant case with having previously pleaded guilty to illegal possession of a stolen automobile on 17 September 1999 in case number 409-424. He makes no appellate argument that the ten-year cleansing period elapsed as to that 1999 conviction. Regardless, the only document in the record from case number 409-424 is a docket master containing a 17 September 1999 entry, reflecting that the defendant appeared before the court unattended by counsel for arraignment; that the court appointed counsel; that defendant pleaded guilty as charged; and that he received a suspended two-year sentence, with two years active probation. This September 1999 conviction clearly was less than ten years before the defendant’s commission of the subsequent felony in case number 426-668, which, documents introduced at the habitual offender hearing show, was committed on 5 October 2001. Thus, regardless of when Mr. Watkins was discharged from state custody for the 1999 conviction, the ten-year cleansing period provided for by La. R.S. | ¡¡¡¡15:529.1 C had not expired for the 1999 conviction at the time of the defendant’s commission of the 5 October 2001 felony for which he was convicted in case number 426-663.[5]
Mr. Watkins contends that the 2002 conviction cannot be used to adjudicate him a habitual offender because the state failed to prove that he was the person who pleaded guilty in that case. He asserts no fingerprints were in the certified pack to prove that fact, and no evidence was presented to show that the trial court advised him of the rights he was waiving by pleading guilty. (He asserted both of these grounds in his original written objection to the habitual offender bill of information.)
The state concedes that there were no fingerprints on any document in the certified pack. However, the state correctly submits that fingerprints are not absolutely required to link a defendant to documents evidencing a prior conviction in a habitual offender proceeding, as reiterated by the Louisiana Supreme Court in State v. White, 13-1525 (La.11/8/13), 130 So.3d 298.[6]
*317 1 agin the instant case, as previously discussed, Officer Pollard testified that he took a set of the defendant’s fingerprints in court that day. Officer Pollard testified that he compared the right thumbprint to the right thumbprint contained on a document in the Texas certified pack, and determined that the thumbprints were from the same person.
Importantly, Officer Pollard also identified an arrest register with a full set of fingerprints and palm prints reflecting an arrest on 5 October 2001 of “Keyon D. Watkins;” last four numbers of that individual’s Social Security number being 2402; item number J-00524-016; the specific-to-that-arrest arrest number 11094131; and B of I (Bureau of Identification) number 372182P.
Officer Pollard confirmed that he also reviewed a separate certified pack under item number J-00524-01 under case number 426-663. He stated that the item number on the arrest register was J-00524-01, the arrest number 11094131, and he confirmed that those were the same item and arrest numbers on the arrest register, which he had matched to the defendant based on the fingerprint comparison.
The arrest register, on the back of which were the full set of fingerprints and palm prints, contains the preprinted subheading “Fingerprints Copy.” It is identical to the arrest register contained in the certified pack for case number 426-663, except that the arrest register contains the preprinted subheading “Magistrate Court Copy” instead of “Fingerprints Copy.” The same name, “Keyon D. Watkins”; the same arrest and item numbers; the same B of I numbers; the same Social Security numbers; the same date of birth, 5 January 1980, for the arrestee, “Keyon D. Watkins”; and the same SID number, 2058515, appear on the documents. The |40“Keyon D. Watkins” in case number 426-663 was arrested for possession of a stolen automobile valued at over five hundred dollars.
Thus, even though the defendant is correct that the certified pack in case number 426-663 did not contain any fingerprints, the state linked the certified pack to the defendant by means of appropriate documentary evidence, the arrest register proven to contain the defendant’s fingerprints, which arrest register is, as a practical matter, identical to the one in the certified pack that has no prints. The certified pack contains a bill of information in case number 426-663 charging “Keyon D. Watkins” with possession of a stolen automobile valued at five hundred dollars or more on the date of 5 October 2001, the date both arrest registers reflect that “Keyon D. Watkins” was arrested. A docket master in case number 426-663 lists the defendant’s name as “Keyon D. Watkins” and his date of birth as 5 January 1980, the same name and date of birth listed on both arrest registers, and the same name listed on the bill of information in case number 426-663. An entry on that docket master reflects that the defendant pleaded guilty in case number 426-663 on 27 March 2002.
The certified pack in case number 426-663 contains a plea of guilty form under both case number 426-663 and another case in which the defendant was charged with first offense possession of marijuana. The plea of guilty form contains the initials “K.W.” in multiple places and the signature “Keyon Watkins” at the bottom, above the preprinted word “defendant.”
*318 The form is dated 27 February 2002, while the docket master entry reflects that the defendant pleaded guilty on 27 March 2002. We note that the docket master entry preceding the plea of guilty on 27 March 2002 is dated 22 January 2002, and reflects that on that date (22 January 2002), the trial court denied the defendant’s motion to suppress, and l41set the trial for 27 February 2002. No 27 February 2002 docket master entry is present, suggesting perhaps that the docket master entry reflecting a plea of guilty on 27 March 2002 is incorrect, in that the plea of guilty was actually entered on 27 February 2002, the date reflected on the plea of guilty form.
In any case, the state presented more than sufficient proof that Mr. Watkins was the same person who pleaded guilty on 27 February 2002 in case number 426-663.
Mr. Watkins’ second argument with regard to the 2002 guilty plea conviction is that evidence is absent that the trial court advised him of the rights he was waiving by pleading guilty. He asserts that the plea of guilty form in the certified pack in case number 426-663 is not signed by the trial judge, although a space is present for his signature. However, the copy in the record contains a marking on the judge’s signature line which appears to be an illegible signature, presumably that of the trial judge, Frank A. Marullo, Jr. See State v. Morgan, supra.
Also, as previously mentioned herein-above when addressing issues concerning the defendant’s 2006 Texas conviction, the Louisiana Supreme Court in Morgan, supra, stated that the court of appeal erred in finding that the state had failed to carry its burden under Shelton of showing that the defendant was advised of his rights and had waived them, where “[k]ey in the appellate court’s decision was the absence of the trial judge’s signature on the waiver of rights form, suggesting that the judge was not present at the time defendant was informed of his rights.” Morgan, 13-1495, p. 2, 134 So.3d at 1161. The Court in Morgan was dismissive of that reason by the trial court, noting that even had the trial judge signed the waiver of rights form, such still would not be conclusive proof that the |4i>trial judge directly informed defendant of the rights he was waiving. Id., p. 4,134 So.3d at 1162.
The 27 February 2002 plea of guilty form contains the initials “K.W.” next to each of the following four rights, signifying that the initialing person understood that by pleading guilty he was waiving each of them: (1) the right to trial by judge or jury and, if convicted, the right to appeal; (2) the right to face and cross examine the witnesses against him; (3) the privilege/right against self-incrimination; and (4) the right to subpoena witnesses to appear and testify. In addition, the full signature of “Keyon Watkins” is at the bottom of the waiver of rights form, and underneath is the signature of “the attorney for the defendant.”
The State met its initial burden under Shelton as to the 2002 guilty plea conviction by producing evidence establishing the fact of that prior guilty plea by the defendant and that he was represented by counsel at the time he entered the plea. Thus, the burden shifted to defendant under Shelton to come forward with some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the 2002 guilty plea. Mr. Watkins presented no evidence at all; we find nothing pertaining to the plea of guilty form, or any of the other documents introduced by the state to prove the 2002 guilty plea, that constitutes affirmative evidence showing an infringement of the defendant’s rights or a procedural irregularity in the taking of the plea. Therefore, *319 Mr. Watkins failed to meet his burden under Shelton; the burden never shifted back to the state.
For the foregoing reasons, the trial court erred in not finding Mr. Watkins a fourth-felony habitual offender.
Accordingly, we grant the writ application of the state and reverse the decision of the trial court.
_b¡v.

Conclusion

For the foregoing reasons, the defendant’s convictions and sentences as to both counts are affirmed; the writ application of the state is granted, and the case is remanded to the trial court with directions to vacate the original sentence in Count 1 and resentence defendant as a fourth-felony habitual offender.
CONVICTIONS AND SENTENCES AFFIRMED IN NO. 2013-KA-1248; WRIT APPLICATION GRANTED IN NO. 2013-K-0931; REMANDED WITH INSTRUCTIONS.

. The state timely filed an original notice of intent to seek supervisory review from this court on 9 April 2013. Thereafter, it timely filed five successive motions for extensions of the return date, with the last motion for extension being granted on 28 June 2013, extending the return date to July 2, 2013.

. Utilizing for purposes of estimation only the number of transcript pages in the record for voir dire of the first panel, each prospective juror was questioned for an average of eighty seconds. We recognize that the quality of the voir dire prevails over the quantity or length of the voir dire. The ultimate test is whether sufficient questions were asked such that all parties could intelligently exercise challenges, thereby giving an accused a fair trial. We recognize that it is theoretically possible that defense counsel, realizing that he/she has a limited time period to ask questions of prospective jurors, may dawdle or spend an inordinate amount of time examining one or more prospective jurors, thereby setting up an ap-pealable issue that he was not afforded enough time to voir dire other prospective jurors.

. A "trial docket” (equivalent to a Louisiana docket master) contained in the Texas certified pack reflects that the defendant waived the jury, waived arraignment, and entered a plea of guilty on 22 August 2006, and that the matter was passed to 22 September 2006, which is the date of the judgment of conviction/waiver of jury trial. However, the judgment of conviction/waiver of jury trial form reflects that the guilty plea was officially recorded on 22 September 2006; Mr. Watkins does not suggest any irregularity in this regard.

. Texas Code of Criminal Procedure art. 26.13 states:
(a)Prior to accepting a plea of guilty or a plea of nolo contendere, the court shall admonish the defendant of:
(1) the range of the punishment attached to the offense;
(2) the fact that the recommendation of the prosecuting attorney as to punishment is not binding on the court. Provided that the court shall inquire as to the existence of a plea bargain agreement between the state and the defendant and, if an agreement exists, the court shall inform the defendant whether it will follow or reject the agreement in open court and before any finding on the plea. Should the court reject the agreement, the defendant shall be permitted to withdraw the defendant’s plea of guilty or nolo contendere;
(3) the fact that if the punishment assessed does not exceed the punishment recommended by the prosecutor and agreed to by the defendant and the defendant’s attorney, the trial court must give its permission to the defendant before the defendant may prosecute an appeal on any matter in the case except for those matters raised by written motions filed prior to trial;
(4) the fact that if the defendant is not a citizen of the United States of America, a plea of guilty or nolo contendere for the offense charged may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law; and
(5)the fact that the defendant will be required to meet the registration requirements of Chapter 62, if the defendant is convicted of or placed on deferred adjudication for an offense for which a person is subject to registration under that chapter.
(b) No plea of guilty or plea of nolo conten-dere shall be accepted by the court unless it appears that the defendant is mentally competent and the plea is free and voluntary.
(c) In admonishing the defendant as herein provided, substantial compliance by the court is sufficient, unless the defendant affirmatively shows that he was not aware of the consequences of his plea and that he was misled or harmed by the admonishment of the court.
(d) The court may make the admonitions required by this article either orally or in writing. If the court makes the admonitions in writing, it must receive a statement signed by the defendant and the defendant’s attorney that he understands the admonitions and is aware of the consequences of his plea. If the defendant is unable or *312 refuses to sign the statement, the court shall make the admonitions orally.
(e) Before accepting a plea of guilty or a plea of nolo contendere, the court shall, as applicable in the case:
(1) inquire as to whether a victim impact statement has been returned to the attorney representing the state and ask for a copy of the statement if one has been returned; and
(2) inquire as to whether the attorney representing the state has given notice of the existence and terms of any plea bargain agreement to the victim, guardian of a victim, or close relative of a deceased victim, as those terms are defined by Article 56.01.
(f) The court must substantially comply with Subsection (e) of this article. The failure of the court to comply with Subsection (e) of this article is not grounds for the defendant to set aside the conviction, sentence, or plea.
(g) Before accepting a plea of guilty or a plea of nolo contendere and on the request of a victim of the offense, the court may assist the victim and the defendant in participating in a victim-offender mediation program.
(h) The court must substantially comply with Subsection (a)(5). The failure of the court to comply with Subsection (a)(5) is not a ground for the defendant to set aside the conviction, sentence, or plea.
(i) Notwithstanding this article, a court shall not order the state or any of its prosecuting attorneys to participate in mediation, dispute resolution, arbitration, or other similar procedures in relation to a criminal prosecution unless upon written consent of the state.

. We do not find it necessary to address the state’s motion to supplement the record in this regard.

. The Court set forth the applicable law in White as follows:
To meet its burden under the Habitual Offender Act, the State must establish both the prior felony conviction and the defendant's identity as the same person who committed that prior felony. State v. Pay-ton, 00-2899, p. 6 (La.3/15/02), 810 So.2d 1127, 1130; State v. Neville, 96-0137, p. 7 (La.App. 4 Cir. 5/21/97), 695 So.2d 534, 539-40. This Court has repeatedly held the Habitual Offender Act does not require the State to use a specific type of evidence to carry its burden at a habitual offender hearing. Rather, prior convictions may be proved by any competent evidence. Pay-ton, 00-2899 at p. 8, 810 So.2d at 1132; *317 State v. Blackwell, 377 So.2d 110, 112 (La. 1979); State v. Curtis, 338 So.2d 662, 664 (La. 1976). White, 13-1525, p. 2, 130 So.3d at 300.