MAX N. TOBIAS, JR., Judge.
|T The defendant, Andre J. Davis (“Mr. Davis”), appeals his conviction of the crime of domestic abuse battery involving strangulation, a violation of La R.S. 14:35.3 L. He assigns three errors on appeal, asserting the insufficiency of the evidence to sustain his conviction and the ineffective assistance of counsel. Finding that merit exists, in part, to his assignment of error regarding the sufficiency of the evidence to sustain his conviction for domestic abuse battery involving strangulation, we hold that Mr. Davis is guilty of the lesser included offense of simple battery, enter judgment to that effect, and remand this matter to the trial court for imposition of sentence.

PROCEDURAL HISTORY

Mr. Davis was charged by bill of information on 3 December 2012 with the 18 January 2012 domestic abuse battery involving strangulation (“the incident”) of Eugenia Leonard (“Ms. Leonard”), the victim. He entered a plea of not guilty at his 1 February 2013 arraignment, was tried by bench trial[1] on 28 June 2013, and found guilty as charged for domestic abuse battery involving strangulation. Mr. |2Pavis waived all legal delays and was sentenced that same day to two years at hard labor, suspended, with two years of active probation.[2] This appeal followed.

SUMMARY OF TESTIMONY

I. Ms. Leonard’s testimony

(A) Direct Examination

Ms. Leonard testified that on 18 January 2012, she was at her apartment with her six-week-old infant daughter and Mr. Davis. Mr. Davis was in Ms. Leonard’s bedroom, intending to take a nap, when she asked him to watch her daughter while she took a shower. Mr. Davis refused despite Ms. Leonard’s entreaties to do so. She turned on the lights — presumably in her bedroom, where Mr. Davis was located — and told him to get up and leave her apartment. He finally got up and began dressing. After he dressed, he walked through the doorway to her bedroom, where she was standing, and pushed her against the wall and down the hallway with his body. She turned and ran into the hallway bathroom, whereupon Mr. Davis put his hands around her neck, began choking her, and pushed her head up against the wall; she was holding her baby as she was being choked. She closed her eyes and fell down. When she opened her eyes Mr. Davis was still standing in the doorway. He walked away. She got her keys, went to sit in her car, and telephoned Mr. Davis’ parents, thinking that would ultimately result in Mr. Davis leaving.[3]
IsThe following day, Ms. Leonard went to the police to seek a restraining order against Mr. Davis. She was told she *584 would have to press- charges, and she did so.[4]

(B) Cross-Examination and Re-Direct Examination

Ms. Leonard testified on cross-examination that, following the argument, Mr. Davis got dressed in her bedroom. She was standing outside her bedroom door in the hallway. Mr. Davis left her bedroom and' turned to walk down the hall toward the living room. She restated that he was pushing her down the hall with his body/ chest as he proceeded. She asserted-that she was up against the wall and that Mr. Davis could have passed by her without contacting her. She explained that Mr. Davis was six feet nine inches tall, while she was five feet eleven inches tall. As he backed her down the hallway for several feet, she got to a narrow hallway bathroom into which she backed all the way to the rear wall/towel rack thereof, where he began choking her. When asked why she had not continued down the hall to the living room instead of entering the hall bathroom, she explained that it was because Mr. Davis had to leave her apartment through her living room. Ms. Leonard was asked if she fought back — kicked him or -scratched him — as he choked her; she did not. When asked if she had put up her hands in a defensive manner, she replied in the negative for she was .cradling her baby with both hands for she felt she was protecting her baby. When Ms. Leonard regained consciousness, she was sitting on the floor with her legs extended to front of her and her back against the wall, with her daughter in her arms/lap.
|4Ms. Leonard stated that she and Mr. Davis had been involved together for three or four years. She confirmed that they had been to counseling before, trying to find a way to work together for the benefit of their daughter. She related that the counselor had told her she should not go to court because she should not-ruin his life, she was too old to date him, and it was her fault. She denied that she was angry when Mr. Davis told her he would not take care of the baby, saying she was just tired. When asked why she told him to leave, she replied that she felt that if he did not want to help her with the baby, was not working, paid none of the bills to the house, and contributed nothing to the household, then he should just leave. She said Mr. Davis was a student at Southern University of New Orleans (“SUNO”) at the time, and that he had moved out of his dormitory to “stay with” her. (No time frame for his moving out of the dormitory or why was indicated.) She admitted having attacked Mr. Davis previously, but she denied doing so on the day of the incident.
On redirect examination Ms. Leonard said she had been in a prior physical altercation with Mr. Davis during which he struck her.[5]
II. Mr. Davis’ testimony

(A) Direct Examination

Mr. Davis testified that he and Ms. Leonard met when they were both attending SUNO. He did not have a car, so Ms. Leonard would pick him up. He ^stated *585 that at the time of the incident, he did not want to be involved in an intimate relationship with her; however, he wanted to be around his daughter. He asserted he always had an issue with Ms. Leonard. Nevertheless, he still came over to her apartment. On the day of the incident, Mr. Davis was lying down with the baby and Ms. Leonard came and picked up the baby. He said she went out and did some things, then returned, and asked him to watch the baby “again¿” -He said he did not want to watch the baby further, at which point Ms. Leonard became irate and told him to leave.
Mr. Davis stated that he got dressed and was getting ready to leave, but Ms. Leonard stood in the doorway, holding the baby in her right arm, and kept pushing him back with her left arm. She kept asking him why he was doing this to her, insinuating that he did not want to help her at all with their daughter. He got past her and walked out of the room toward the front of the apartment. They were still arguing and probably were saying very mean, nasty things to each other. Ms. Leonard went into the bathroom[6] and continued screaming at him. He said he turned around, came back, and tried to enter the bathroom. She continued to try to push him, but fell backwards.
Mr. Davis acknowledged that he and Ms. Leonard had had physical altercations in the past where Ms. Leonard attacked him. However, she usually hurt herself when she did that, giving as an example when Ms. Leonard fell backwards in the bathroom in this instance. He said that after Ms. Leonard fell, he telephoned his own parents; they told him he had to leave the situation, and they would take him to a movie or something similar.
1 (¡Mr. Davis denied ever choking Ms. Leonard or putting his hands around her neck. He described their prior altercations: Ms. Leonard being the aggressor and he grabbing her and trying to restrain her “or something like that.” He said they never got into shoving matches, but that he had physically restrained her to keep her from hitting him. On the day of the incident, she pushed him, but he denied hitting her back or pushing her down with his baby, averring he would never do anything to hurt her with his child in her arms. ' His feelings were hurt that it was being said that he did such a thing. He 'denied ever beating her- head against a wall: When asked if Ms. Leonard was aware he was seeing other women, he responded ‘Yes, yes, yes.” He said he did not know whether at that time of the incident he was seeing anyone else, but that the issue had come up before. He confirmed that Ms. Leonard was angry about him returning to campus life and not participating in his daughter’s life. In fact, he corrected Ms. Leonard’s testimony, stating that at the time of the incident, the “semester had started back” and he was then living on campus in a dorm room.

(B) Cross-Examination

On cross-examination, Mr. Davis stated that he and Ms. Leonard had joint custody of their daughter, but they had never gone to court concerning it. He paid Ms. Leonard child support in the form of a Wal-Mart money card; he could show the balance on the card was then $400. He asserted that he gave her what a court would make him give her based on what he then presently earned. He noted that “she,” apparently meaning Ms. Leonard, was then (at the time of trial) - staying with his family, presumably 'with their daughter. He did not know whether his daughter was injured when Ms. Leonard fell backward in the bathroom on the day-of the-incident, but the baby was .not crying. Mr. Davis *586 said Ms. Leonard had hit him |7with a closed fist on two separate occasions, but he had never caused physical harm to her during their entire relationship.

ERRORS PATENT

A review of the record reveals one error patent on the face of the record. Mr. Davis was found guilty of domestic abuse battery involving strangulation, a felony under La. R.S. 14:353 L. He was only charged with a violation of that one statute. The sentence imposed upon him (two years at hard labor, suspended, with two years of active probation) does not comply with La.C.Cr.P. art. 895 L[7] [now, per La. Acts 2015, No. 705, § 2, La.C.Cr.P. art. 895 M] and is therefore illegally lenient. That is, his sentence does not require that he “successfully complete a court-approved course of counseling or therapy related to family or dating violence, for all or part of the period of probation.” The state did not object to Mr. Davis’ sentence and has not appealed the issue. Notwithstanding this error, the ^remainder of our opinion that finds Mr. Davis guilty of simple battery moots the issue because simple battery is not a crime of domestic abuse.
PRELIMINARY MATTERS RELATED TO THE NATURE OF LA. R.S. 14:35.8
Before addressing Mr. Davis’ assignment of errors, we first address the responsive verdicts to the crime of domestic abuse battery involving strangulation under La. R.S. 14:35.3.
At the time of the incident, La. R.S. 14:35.3 stated in pertinent part:
A. Domestic abuse battery is the intentional use of force or violence committed
by one household member upon the person of another household member.
B. For purposes of this Section:
[[Image here]]
(2) “Household member” means any person of the opposite sex presently living in the same residence or living in the same residence within five years of the occurrence of the domestic abuse battery with the defendant as a spouse, whether married or not, or any child presently living in the same residence or living in the same residence within five years immediately prior to the occurrence of domestic abuse battery, or any child of the offender regardless of where the child resides.
(3) “Strangulation” means intentionally impeding the normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of the *587 victim.[8]
C. On a first conviction, notwithstanding any other provision of law to the contrary, the offender shall be fined not less than three hundred dollars nor more than one thousand dollars and shall be imprisoned for not less |9than thirty days nor more than six months. At least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence. Imposition or execution of the remainder of the sentence shall not be suspended unless either of the following occurs:
(1) The offender is placed on probation with a minimum condition that he serve four days in jail and participate in a court-monitored domestic abuse intervention program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.
(2) The offender is placed on probation with a minimum' condition that he perform eight, eight-hour days of court-approved community service activities and participate in a court-monitored domestic abuse intervention program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.
[[Image here]]
I. This Subsection shall be cited as the “Domestic Abuse Child Endangerment Law.” When the state proves, in addition to the elements of the crime as set forth in Subsection A of this Section, that a minor child thirteen years of age or younger was present at the residence or any other scene at the time of the commission of the offense, of the sentence imposed by the court, the execution of the minimum mandatory sentence provided by Subsection C or D of this Section, as appropriate, shall not be suspended, the minimum mandatory sentence imposed under Subsection E of this Section shall be two years without suspension of sentence, and the minimum mandatory sentence imposed under Subsection F of this Section shall be four years without suspension of sentence.
[[Image here]]
L. Notwithstanding any other provision of law to the contrary, if the domestic abuse battery involves strangulation, the offender shall be imprisoned at hard labor for not more than three years. [Emphasis supplied.]
La. R.S. 14:33 defines “battery” as “the intentional use of force or violence upon the person’ of another; or the intentional administration of a poison or other noxious liquid or substance to another.” Per La. R.S. 14:35; “simple battery” is|indefined as “a battery committed without the consent of the victim,” the penalty for which is a fine of “not more than one thousand dollars or imprisoned for not more than six months, or both.”
Despite our inability to find Louisiana jurisprudence addressing the precise issue, and because the possible verdicts to the crime of which Mr. Davis was charged are not expressly addressed by La.C.Cr.P. art. 814, we find that pursuant to La. C.Cr.P. art. 815,[9] both domestic abuse bat *588 tery and simple battery are lesser included grades of and a responsive verdict to the offense of domestic abuse battery involving strangulation.[10]
Secondly, and more important to this case, we find that the phrases in La. R.S. 14:35.3 B(2)[11] addressing a “person of the opposite sex presently living in the same residence” and “a spouse, whether married or not” encompass the following essential elements to constitute the crime of domestic abuse battery:
(1) two individuals of the opposite sex married to each other,[12] or
(2) two unmarried individuals of the opposite sex living in “open concubinage,”
and
|1¶(3) who are or were residing together in the same dwelling within the preceding five years.
We find that the only way to. logically interpret and understand the La. R.S. 14:35.3 B(2) [now La. R.S. 14:35.3 B(4) ] definitional phrase “household member,” and more specifically the phrase-in the definition, “a spouse, whether married or not,” is to analogize to the Louisiana concept of open concubinage, which is essentially similar to a common law marriage.[13]
While “open concubinage” has not been defined by statute, our jurisprudence is helpful in determining the meaning of the phrase. The case of Petty v. Petty, 560 So.2d 629, 630-31 (La.App. 4th Cir.1990) thoroughly discussed the development of the term “open concubinage” stating:
The Civil. Code does not define “open concubinage”, but three cases have considered its meaning; Thomas v. Thomas, 440 So.2d 879 (La.App. 2 Cir.1983), writ denied 443 So.2d 597; Gray v. Gray, 451 So.2d 579 (La.App. 2 Cir.1984), writ denied 457 So.2d 13 and Theriot v. Theriot, 546 So.2d 589 (La.App. 1 Cir.1989), writ denied 550 So.2d 635. The Thomas, Gray and Theriot courts each found there was not “open concubinage”.
In Thomas the Court offered the following excellent summary:
In defining and applying the term open concubinage, the courts have historically | ^insisted that a definite *589 meaning be ascribed to both the words “open” and “concubinage,” before finding that the legal requisites of open concubinage have been proven. “Concubinage” is derived from the Latin term Concubinatus. This term signified, in roman civilization, a relationship or cohabitation in which the man and woman generally resided together as husband and wife without the benefit of the formalities, civil effects and legal consequences of a formal marriage. Succession of Jahraus, 114 La. 456, 38 So. 417 (1905). Thus to this day, concubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married. Henderson v. Travelers Ins. Co., 354 So.2d 1031 (La.1978); Succession of Moore, 232 La. 556, 94 So.2d 666 (1957); Succession of Franz, 232 La. 310, 94 So.2d 270 (1957); Succession of Jahraus, supra; Succession of Keuhling, 187 So.2d 520 (La.App. 3d Cir.1966); Purvis v. Purvis, 162 So. 239 (La.App. 2d Cir.1935). It is crucial to the definition of open concubinage to note that it depicts a status or relationship, rather than an act or series of acts. Succession of Moore, supra; Succession of Franz, supra; Succession of Jahraus, supra; Succession of Keuhling, supra. Concubinage is not constituted merely by “acts of fornication or adultery, however frequent or even habitual.” Succession of Jahraus, 38 So. at 418. Moreover, “the concubine must not be confounded with the courtezan [sic], or even with what is ordinarily called a mistress. She is the wife without a title.”, Gauff v. Johnson, 161 La. 975, 109 So. 782, 783 (1926). Concubinage depicts a state of affairs in which the man and woman exercise with respect to each other the rights and privileges of marriage. Succession of Lannes, 187 La. 17, 174 So. 94 (1936). Thus, concubinage could be defined as a relationship of sexual content in which man and woman live together as husband and wife in a state of affairs approximating marriage. It should be noted, however, that 11salthough living together is important to , a finding of concubinage, it is not absolutely essential. Succession of Filhiol, 119 La. 998, 44 So. 843 (1907); Succession of Jahraus, supra; Succession of Keuhling, supra, Succession of Hamilton, 35 La. Ann. 640 (La.1883); Paxton v. Paxton, 173 So. 488 (La.App. 1 Cir.1937).
See also Booth v. Samuels, 97-2395 (La.App. 4 Cir. 5/20/98), 712 So.2d 1037.
Further, this interpretation is supported by a reading of, the definition of “household member” as originally proposed in House Bill No. 849 of the 2003 Regular Louisiana Legislative Session that enacted La. R.S. 14:35.3 which read:
(1) “Household member” means any person of the opposite sex presently or formerly living,in the same residence with defendant as a spouse, whether married or not.
That definition of “household member” was amended before House Bill No. 849 was enacted by La. Acts 2003, No. 1038, § 1 to read:
(1) “Household member” means any person of the opposite sex presently living in the same residence or living in the same residence within five years of the occurrence of the domestic abuse battery with the defendant as a spouse, whether married or not. ’
This amendment replaced the open-ended “formerly living in the same residence” clause with the more restrictive “living in the same residence within five years of the *590 occurrence of the domestic abuse battery” clause. The amended definition of “household member” was contained in La. R.S. 14:35.3, as enacted by La. Acts 2003, No. 1038, § 1.
Pursuant to the legislative history of this statute, the legislature intended that both those “presently living in the same residence” and those “living in the same residence within five years of the occurrence of the domestic abuse battery” must have been living with each other “as a spouse, whether married or not” in order to |14be considered “household members.” Also, given that domestic abuse battery is defined as the intentional use of force or violence committed by me household member upon the person of another household member, both the “defendant,” as that term is used in defining “household member,” and the victim, must each be a “household member” at the time of the occurrence.
La. R.S. 14:35.3 does not per se define “spouse.” However, given (a) the commonly-accepted definition of the term “spouse,” (b) the qualifying language in La. R.S. 14:35.3 B(2) immediately following the term “spouse” (“whether married or not”), and (c) the present limitation of a “household member” to “any person of the opposite sex” (as well as the fact that Mr. Davis is a male and the victim is a female), the term “spouse” as used in the definition of “household member” and applicable in the present case refers to a husband or a wife (both of the same marriage) or to two persons of the opposite sex living together in open concubinage.
The interpretation of legislation is primarily the search for the legislative intent. Louisiana Safety Assn. of Timbermen Self-Insurers Fund v. Louisiana Ins. Guar. Assn., 09-0023, p. 8 (La.6/26/09), 17 So.3d 350, 355-56. See also La. C.C. art. 2; La. R.S. 24:177 B(1) (text of a law is the best evidence of legislative intent). When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent underlying its enactment. State in Interest of K.L.A., 14-1410, p. 5 (La.6/30/15), 172 So.3d 601, citing La. R.S. 1:4.[14]
ImThus we find, and particularly applicable to the case at bar because Mr. Davis and Ms. Leonard were not married to each other, that to determine whether the evidence was sufficient to convict the accused of domestic abuse battery involving strangulation, the evidence taken as a whole must establish beyond a reasonable doubt that the victim and the accused were living in open concubinage. The definition of “household member” as applicable to the present case is thus not ambiguous.
With the foregoing in mind, we now proceed to address Mr. Davis’ assignments of error.

ASSIGNMENTS OF ERROR

ASSIGNMENT OF ERROR NO. 1

Mr. Davis first argues that the evidence is insufficient to support his conviction.
This court set forth the well-settled standard of review for sufficiency of the evidence in State v. Watkins, 13-1238 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in *591 the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon 116only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Watkins, 13-1238, pp. 13-14, 146 So.3d at 303, quoting State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.
The testimony of a single witness, if believed by the trier of fact, may be sufficient to support a conviction. Watkins, 13-1238, p. 14, 146 So.3d at 303, citing State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. See Watkins. (Of course, a single piece of corroborating evidence, no matter how small, is highly preferable to none, for a “he said, she said” case always presents problems of meeting the “beyond a reasonable doubt” standard.)
The due process standard of review under Jackson does not sanction speculation if the evidence is such that a reasonable fact finder must have a reasonable doubt. State v. Higgins, 03-1980, pp. 17-18 (La.4/1/05), 898 So.2d 1219, 1232; State v. Gordon, 13-0495, p. 18 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 770.
Mr. Davis was charged with and convicted of domestic abuse battery involving strangulation, a violation of La. R.S. 14:35.3 L. His sufficiency argument is directed to the issue of whether, at the time of the incident, he was a “household member” within the meaning of the statute.
In enacting La. R.S. 14:35.3, the legislature obviously intended to exclude from its application members of the opposite sex who engaged in “one-night stands” and “multi-night stands,” otherwise known as a *592 “fling,”[15] who were merely engaged in a dating, albeit periodically and in, an ongoing intimate relationship for a significant period of time. The evidence clearly establishes that Mr. Davis and Ms. Leonard had been dating for a few years and staying [16] together overnight at some point pri- or to the incident. Ms. Leonard testified they had been together since 2009, for three to four years. That was not disputed by Mr. Davis. He testified that he met Ms. Leonard at SUNO when he was a freshman and she was finishing her studies; at the time of the incident, he was in his last semester. The evidence supports a finding that Mr. Davis had just moved back into a dormitory for that last semester, and an inference that he had recently moved into that dormitory from Ms. Leonard’s apartment or his parents’ home. Ms. Leonard testified that Mr. Davis had moved out of the dormitory to “stay with” her, obviously referring to an earlier point in their relationship. Mr. Davis also acknowledged “staying with” Ms. Leonard.
lisWe note the absence of any evidence that any personal items belonging to Mr. Davis were present in Ms. Leonard’s apartment on the day of the incident except the clothes he was wearing. In fact, we find no evidence that he kept his clothes at her apartment at any point during their relationship. We find no evidence that Mr. Davis had ever received mail at her apartment. Similarly, we find no evidence that Mr. Davis was sharing in the expenses of Ms. Leonard during the time they were staying. together. Ms. Leonard testified that she pressed charges against Mr. Davis for the domestic abuse battery so she could get a restraining order against him, to keep him away from her apartment. (Obviously, she was misinformed by the police that she had to press charges in order to obtain a restraining order.) •
Although Ms. Leonard and Mr. Davis were romantically involved, the evidence doe's not establish that Mr. Davis and Ms. Leonard were “living” together “in the same residence or living in the same residence within five years of the occurrence of the domestic abuse battery with the defendant as a spouse, whether married or not.” La. R.S. 14:35.3 B(2) [emphasis supplied.] That is to say, the evidence at trial dóés not establish beyond a reasonable doubt that the victims were living in open concubinage. Under the statute as written,[17] we find that in order to prove that two individuals of the opposite' sex are living together and in a manner equivalent to being a spouse of each other requires the prosecution to prove beyond a reasonable doubt some of the indices of a marriage: for example, both parties had substantially all of their clothing at the same^ abode, both parties were receiving regular mail at the same address, both parties acted like they were actually married |i9or held themselves out to the world as a married couple, et cetera. See Petty, supra. That evidence is lacking in this case.
Ms. Leonard never directly or indirectly testified that Mr. Davis was the father of her daughter. She did say that she left her apartment while he was still inside on the day of the incident and telephoned his parents from inside.her [parked] car. We also note testimony concerning after-the-incident evidence of Mr. Davis’ paternity, *593 in that he provided support for the child through a Wal-Mart- money card to which he would add funds, and that at the time of trial Ms. Leonard was living with Mr. Davis’ parents, presumably with her daughter.
It was Ms. Leonard’s apartment, and the record establishes that she believed she could order Mr. Davis out any time she wished. As Ms: Leonard testified, she ordered him to leave her apartment on the day of the incident. Mr. Davis freely saw other women, according to his uncontra-dicted testimony, and that the issue of his seeing other women' had come up between them before. The suggestion is clear that his seeing other women had gone on while he was living with Ms. Leonard prior to the incident at issue. Our detailed reading of the evidence indicates that the defendant and the victim were not living in open concubinage.
We also find it somewhat questionable whether Mr. Davis, or for that matter Ms. Leonard, viewed or would have characterized their relationship as that of a “spouse,” a “husband” in Mr. Davis’ case and a “wife” in Ms. Leonard’s case, or open concubinage. However, we perceive that, in enacting La. R.S. 14:35.3, the legislature intended on some level to proscribe batteries committed under circumstances such as those of the present case, and thus that this type of relationship (open concubinage) was contemplated in drafting and enacting of the domestic abuse battery law.
lapEven viewing áll the evidence in a light most favorable to the prosecution, we find that no rational trier of fact'could have found beyond a reasonable doubt that Mr. Davis and Ms. Leonard were living in the same residence within five years of the incident of the domestic abuse battery as spouses, although not married, and thus, that they were both “household members” as contemplated by La. R.S. 14:35.3 B(2) [now La. R.S. 14:35.3 B(4) ]. Therefore, we find that the state has failed to carry its burden to establish that Mr. Davis violated La. R.S. 14:35.3.
But our inquiry and analysis does not end there’. The-evidence does establish beyond a reasonable doubt that Mr. Davis committed a simple battery (a violation of La. R.S. 14:35 and a lesser included offense of La. R.S. 14:35.3) upon Ms’ Leonard.[18] Thus, we find that a rational trier of fact would find Mr. Davis guilty of simple battery.
Accordingly, we find merit to Mr. Davis’ first assignment of error, but only insofar as the lack of-sufficient evidence to establish beyond a reasonable doubt the crime of domestic abuse battery involving strangulation and the lesser included offense of domestic abuse battery as defined by Louisiana law.' We also find sufficient evidencé beyond a reasonable doubt and, in a light most favorable to the prosecution, to establish that Mr. Davis is guilty of the crime, of simple battery. Accordingly, we find Mr. Davis 'guilty of the crime of simple battery.

ASSIGNMENT OF ERROR NO. 2

In'his second assignment of error, Mr. Davis argues that his trial counsel was ineffective in failing to move for a judgment of acquittal at the close of the state’s | ¾1 evidence, choosing instead to cross-examine Ms. Leonard arid elicit from her testimony the state had not; and which was necessary to prove its case. Additionally, he asserts that his counsel was ineffective for not moving for an acquittal at the close of the state’s case pursuant to La.C.Cr.P. art. 778 which states:
*594 In a trial by the judge alone the court shall enter a judgment of acquittal on one or more of the offenses charged, on its own motion or on that of defendant, after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.
If the court denies a defendant’s motion for a judgment of acquittal at the close of the state’s case, the defendant may offer its evidence in defense. [Emphasis supplied.]
This court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 10-1114, pp. 58-59 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, as follows:
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, [97-2061,] p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
This court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
One of Mr. Davis’ arguments as to ineffective assistance of counsel concerns his counsel’s alleged failure to move for a judgment of acquittal pursuant to La. C.Cr.P. art. 778 before cross-examining Ms. Leonard. Obviously any such motion for acquittal pursuant to Article 778 before the state rested would be premature. By not cross-examining Ms. Leonard once the state had no further questions of her on direct examination, Mr. Davis’ counsel *595 would at that point have precluded further redirect examination of Ms. Leonard or rebuttal after he cross-examined her. A decision to defer cross-examining Ms. Leonard until the defendant’s case in chief is trial strategy because Mr. Davis’ counsel may have well been attempting to obtain a decision of not guilty on not only the offense charged but also all lesser included offenses. (Of course, it is also possible that Mr. Davis was insisting that he wanted to testify under all circumstances.) It is obvious that the state proved beyond a reasonable doubt that Mr. Davis was guilty of simple battery based upon Ms. Leonard’s testimony on direct examination laaalone. No indication exists that the prosecution realized it had failed to, establish the essential elements of the crime of domestic abuse battery involving strangulation or domestic abuse battery through its direct examination, to-wit, the open concubinage (living like a man and woman without the benefit of marriage) portion of proof required to prove beyond a reasonable doubt the statutory domestic abuse battery involving strangulation or domestic abuse battery.[19]
Additionally, Mr. Davis’ ineffective assistance of counsel claim addresses his trial counsel’s act of actually cross-examining Ms. Leonard during which he elicited additional facts’ about the incident from which an essential element of the state’s case could have been inferred. On some level, by virtue of the trial court’s decision ultimately finding Mr. Davis guilty' as charged, one could logically argue that Ms. Leonard’s testimony on cross-examination enhanced the state’s case against , the accused. But once again, the decision to cross-examine Ms. Leonard at the point of the case that counsel did so was trial strategy. And by our ultimate conclusion in this matter that all that the state proved was guilt of simple battery, the argument of the timing of cross-examining of Ms. Leonard is a moot point. Mr. Davis concedes that all the state proved through its direct examination of Ms..Leonard, accepting her testimony as true, was that he committed the crime of simple battery— the intentional use of force or violence upon the person of another committed without the consent of the victim. See La. R.S. 14:34 and La. R.S. 14:35.
I^Mr. Davis argues, and the record clearly reflects, that the state failed to elicit from Ms. Leonard any. testimony that established, directly or by inference (relative to the definition of “household member”), that Mr. Davis was either: (1) “presently living [at the time of the incident] in the same residence” as Ms. Leonard; (2) “living in the same residence within five years of the occurrence of the domestic abuse battery;” or (3) that he had lived in the same residence as Ms. Leonard at any point “as a spouse, whether married or not.”
Mr. Davis asserts that his trial counsel “elicited the very testimony that the State had failed to garner regarding her and Mr. Davis’s living situation at the time of the alleged offense.” He correctly points out that his counsel elicited from Ms. Leonard the only evidence (at that point in the trial) that he arid Ms. Leonard had stayed in the same residence at any point in time. This evidence would in part be crucial in finding the evidence sufficient to sustain his conviction for domestic abuse battery. We note that at no point in Ms. Leonard’s direct examination testimony did she ever *596 mention that her six-week-old infant daughter, whom she asked Mm Davis to watch while she took a shower, was Mr. Davis’ daughter. Ms. Leonard testified on direct that she lived “with my daughter” at the time of trial. She stated that she asked Mr. Davis to “watch her” while she took a shower, prompting the prosecutor to ask:
Q. And when you say “watch her,” you are talking about your child?
A. Yes.
Q. Okay. At some point, did you stop asking him to watch your child and to do something else?
Ms. Leonard subsequently testified on direct examination that when Mr. Davis began choking her she “started holding onto my baby.”
lasMs. Leonard did not testify on direct examination as to any aspect of her relationship with Mr. Davis except as to .the immediate facts and circumstances surrounding the incident for which Mr. Davis was being tried. She did not mention anything about Mr. Davis being a student, a dorm room, or that Mr. Davis had ever “stayed with” her. She did testify that Mr. Davis was on the bed, intending to take a nap, and that he got dressed after she told him to leave the apartment, inferring that in fact he had been undressed to some degree while lying on the bed. ' Ms. Leonard testified on direct examination that she called Mr. Davis’ parents on the day of the incident, suggesting she had more than a casual acquaintance with him. In addition, Ms. Leonard testified that she went to the police to obtain a restraining order against defendant — “so he wouldn’t have to come around or he wasn’t allowed to come over to my place anymore” — again suggesting perhaps more than a casual intimate acquaintance with him.
However, viewing the direct examination testimony, of. Ms. Leonard alone, in a light most favorable to the prosecution, no rational trier of fact could have found .beyond a. reasonable doubt that defendant committed a domestic abuse battery involving strangulation upon Ms. Leonard because no proof beyond a reasonable doubt was presented that he and Ms. Leonard were “household members” within the meaning of the domestic abuse battery statute.[20]
We also find no merit to Mr. Davis argument of ineffective assistance of counsel relating to La.C.Cr.P. art. 778. Pursuant to Article 778, in a judge trial, 12ñthe court “shall enter a judgment of acquittal” on the offense charged “on its own motion or that of defendant, after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.”
Our reading of the law is that when the state filed a bill of information charging Mr. Davis with domestic abuse battery involving strangulation, they simultaneously charged him with any and all lesser included offenses pursuant to La.C.Cr.P. art. 815. We find no requirement in the law that the state must state in a bill of information or indictment each lesser possible included offense under La.C.Cr.P. arts. 814 or 815 or must set forth each lesser included offense in a separate count. Thus, when Article 778 speaks to “one or more of the offenses charged,” it is simul *597 taneously referring not only to the greater offense but also all lesser offenses.[21]
A motion for judgment of acquittal, pursuant to La.C.Cr.P. art. 778, is properly overruled if the state has produced sufficient evidence to support “each element of the crime charged.” State v. Nogess, 98-0670, pp. 7-8 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 136; State v. Henderson, 95-0267, p. 9 (La.App. 4 Cir. 4/3/96), 672 So.2d 1085, 1091, citing State v. Griffon, 448 So.2d 1287, 1293 (La.1984). The denial of such motion is reversible on appeal only if no evidence of an essential element of the crime is present. Nogess, 98-0670, p. 8, 729 So.2d at 136; Henderson, 95-0267, pp. 8-9, 672 So.2d at 1091, citing State v. Price, 454 So.2d 377, 378 (La.App. 4th Cir.1984).
Mr. Davis would have been entitled to a judgment of acquittal only of the crimes of domestic abuse battery involving strangulation and domestic abuse battery pursuant to La.C.Cr.P. art. 778 had he (1) refrained from cross-examining Ms. Leonard, which (the record reflects) would have resulted at the close of the state’s evidence; or (2) then moved for a judg: ment of acquittal. He could not, however, been. acquitted on the lesser and included offense of simple battery.
We acknowledge that La. C.Cr.P. art. 778 is silent with respect to the situation where the judge in a bench trial, in lieu of rendering á judgment of acquittal, must render a judgment of guilty of a lesser included responsive offense. See La. R.S. 14:34 (defining battery) and La. R.S. 14:35 (defining simple battery).[22] Contrast the motion for judgment of acquittal in a judge trial pursuant to La. C.Cr.P. art. 778 with the motion for post-verdict judgment of acquittal in a jury trial pursuant to La.C.Cr.P. art. 821.[23] The *598 latter article expressly provides l^that if the trial or the appellate court finds that the evidence, viewed in a light most favorable to the state, “supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post-verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.” La.C.Cr.P. art. 821 E.
We note the case of State ex rel. Robinson v. State, 367 So.2d 360 (La.1979), where the Louisiana Supreme Court stated:
One essential distinction between the directed verdict and the jury verdict is that the jury has the option to return a verdict of guilty on a lesser and included offense while the trial judge’s directed verdict of acquittal can only be on the charge contained in the indictment. The state argues that this difference means that a judge’s directed verdict of acquittal of first-degree murder is “limited”, i.e., it is only a legal holding as to the offense charged and leaves unanswered the question of the defendant’s guilt on any lesser or included offenses. In essence, the State maintains that a directed verdict, unlike a jury verdict, is only an acquittal of the offense charged, and not an acquittal of the lesser included offenses.
Id. at p. 362-363. The Court went on to state:
li¡9In construing our former statute on directed verdicts, we consider two established rules of statutory construction: (1) All criminal statutes are construed strictly, and (2) the words of a statute must be read in their every day meaning. Under these principles, the phrase “one or more of the offenses charged” means the offenses which are expressly charged in the bill of information or indictment, whether one or more. The statute cannot be construed, as the State contends, to permit “limited directed verdicts”, i.e., directed verdicts limited to the offense charged and permitting further prosecution of lesser included offenses which are not expressly charged.
Id. at p. 363.
In the recent case of State v. Davenport, 13-1859, p. 20 n. 22 (La.5/7/14), 147 So.3d 137, 150, the Court apparently reaffirmed its statement in Robinson when it said:
In addition to judging guilt and innocence for the charged offense, the jury also decides whether the evidence was sufficient to support a charge of a lesser included offense. In State ex rel. Robinson v. Blackburn, 367 So.2d 360, 362-363 (La.1979), we noted this “essential distinction” between the directed verdict and the verdict of the jury:
One essential distinction between the directed verdict and the guilty verdict *599 is that the jury has the option to return a verdict of guilty on a lesser and included offense while the trial judge’s directed verdict of acquittal can only be on the charge contained in the indictment.
We find that Robinson and Davenport are directed to the issue of double jeopardy and not to the issue of what was actually charged by a bill of information or indictment. Additionally, we hold that an Article 778 motion “for acquittal on one or more of the offenses charged, on its own motion or on that of defendant, after the close of the state’s evidence or of all the evidence by a defendant” means that the defendant should be acquitted of the crime charged and all lesser included |anoffenses. Obviously, in the case at bar, the trial judge did not believe at the conclusion of the state’s case in chief that the state had not proved its case of domestic abuse battery by strangulation and similarly did not find that the reasonable doubt existed to acquit the accused of the La. R.S. 14:35.3 L — witnessed by the fact that he ultimately found Mr. Davis guilty as charged.
In the present case, defense counsel thoroughly cross-examined Ms. Leonard in detail as to the facts surrounding Mr. Davis’ alleged domestic battery upon her, and her actions or inactions relative to the incident, obviously intending to discredit her and/or call into question his commission of a battery. Defense counsel asked about the dorm room, phrasing the question in the form of a statement that Mr. Davis in fact had a dorm room, a fact which would suggest he may not have been “presently living with” Ms. Leonard “in the same residence” at the time of the incident nor, perhaps, that he had not been living with her in the same residence within five years of the incident.
Thus, Mr. Davis’ counsel’s cross-examination of Ms. Leonard was directed at establishing that he was not guilty of the offense for which he was being tried, as well as any lesser and included offenses,
It is well-settled that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986). As “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Bordes, supra, quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
| si Nevertheless, had defense counsel not made the trial tactical decision to cross-examine Ms. Leonard (the only witness called by the state and her testimony being the only material evidence it intended to present), and moved for a judgment of acquittal pursuant to La.C.Cr.P. art. 778 at the close of the state’s evidence, Mr. Davis would have been entitled to such judgment only as to the crimes of domestic abuse battery involving strangulation and domestic abuse battery. Further, had the trial court denied a defense motion for such judgment of acquittal, it is virtually certain he would have prevailed on appeal as to the denial of that ruling as to any form of domestic abuse battery only.
We have — unlike Mr. Davis’ trial counsel or for that matter the trial judge — the benefit of a trial transcript and the opportunity to closely review and parse it to determine whether the direct examination testimony of Ms. Leonard established all the essential elements of domestic abuse battery and/or domestic abuse battery involving strangulation.
*600 However, we state again that defense counsel’s decision to cross-examine Ms.Leonard was a trial tactical decision — an effort to obtain an acquittal not only on the crime charged but also all lesser included offenses — and Mr. Davis has not cited a single appellate decision finding that a trial tactical decision constitutes ineffective assistance of counsel. Further, by our finding that the record in a light most favorable to the prosecution establishes that Mr. Davis is guilty of simply battery and our finding same and entering judgment accordingly, this assignment, of error is mooted or without merit.
| ^¿ASSIGNMENT OF ERROR NO. 3
In his third and final assignment of error, Mr. Davis argues that his trial counsel was ineffective in failing to investigate and subpoena a “necessary witness.” He references the necessary witness as the unnamed counselor who, Ms. Leonard testified at trial, informed her that that the incident of domestic abuse battery was her fault, that she was too old for Mr. Davis, and that she should not go to court because she would ruin Mr. Davis’ life.
Mr. Davis asserts that he “informed his attorney that the counselor would be a necessary witness to rebut.accusations and testify in his behalf.” He further asserts: “It is clear from the testimony of Ms. Leonard that Mr. Davis had informed his attorney of many facts that would have been helpful to his defense had the counselor been called to testify.”
However, while the record reflects that defense counsel knew prior to trial that the couple had been to counseling — given that the issue was first raised in his cross-examination of Ms. Leonard — Mr. Davis fails to suggest how the counselor’s testimony would have benefited his defense to such a degree that “there is a reasonable probability that, but for counsel’s [failure to call the counselor as a witness] the result of the proceeding would have been different.” See Strickland, supra. Regardless, by our holding that he is guilty of simple battery, we do not see how the counselor being called as a witness would affect the outcome of this case.
Given that Mr. Davis does not suggest in any way how defense counsel’s failure to call the counselor as a witness undermined his defense, he has failed to show even the remotest possibility of any merit to this claim.
We find this assignment without merit.

J&CONCLÚSION

For the foregoing reasons, we set aside Mr. Davis’ conviction for the crime of domestic abuse battery involving strangulation, but find Mr. Davis guilty of the lesser included' offense of simple battery and enter judgment accordingly. We remand this matter to the trial court for sentencing of Mr. Davis on the charge of simple battery.
CONVICTION FOR DOMESTIC ABUSE BATTERY INVOLVING STRANGULATION SET ASIDE; CONVICTION FOR SIMPLE BATTERY ENTERED; REMANDED FOR SENTENCING.

. Mr. Davis waived his right to a trial by jury.

. At the time of sentencing, the assistant district attorney advised the court:
Your Honor, I spoke with the victim after the trial had concluded and she has told me she is living with the defendant’s parents and that she expressed an explicit desire. She asked to tell you, or ask you, please don't send him to jail. She asked for probation in this case. He is the father of her child.

.Ms. Leonard was not injured to the degree she needed to seek medical attention, although she claimed her neck was sore. She related no other injuries. See La. R.S. 14:35.3 B(3).

. At this point in the proceedings, the prosecution had no further questions of Ms. Leonard on direct examination.

. Two stipulations were made and accepted: that New Orleans Police Officer Briscoe would testify that he arrested Mr. Davis at a traffic stop of 7 June 2012 and that United States Army Warrant Officer Pugh would testify that hand-to-hand combat training was only given to individuals in the military who were going overseas. This latter stipulation concerned Ms. Leonard’s employment with the United States Coast Guard and that she served’only in this country. Defense counsel did not move for acquittal at the end of Ms. Leonard's testimony and the two stipulations.

. Presumptively, he was referencing the hallway bathroom.

. La.C.Cr.P. art. 985 L stated at the time of the alleged wrongful act:
(1) In all cases where the defendant has been convicted of an offense of domestic abuse as provided in R.S. 46:2132(3) to a family or household member as provided in R.S. 46:2132(4), or of an offense of dating violence as provided in R.S. 46:2151(C) to a dating partner as provided in R.S. 46:2151(B), the court shall order that the defendant submit to and successfully complete a court-approved course of counseling or therapy related to family or dating violence, for all or part of the period of probation. If the defendant has already completed such a counseling program, said counseling requirement shall be required only upon a finding by the court that such counseling or therapy would be effective in preventing future domestic abuse or dating violence.
(2) All costs for the counseling or therapy shall be paid by the offender. In addition, the court may order that the defendant pay an amount not to exceed one thousand dollars to a family violence program located in the parish where the offense of domestic abuse occurred.

. In this opinion, we pretermit a discussion of whether-the state proved beyond a reasonable doubt that Ms. Leonard was the victim of strangulation by Mr. Davis, although that too, beyond a discussion of "household member,” may be a valid inquiry and question, relating to the sufficiency of the evidence and the ineffective assistance of counsel. See State v. Rose, 06-0402 (La.2/22/07), 949 So.2d 1236; State v. Converse, 515 So.2d 601 (La.App. 1st Cir.1987).

. La.C.Cr.P. art. 815 reads as follows;
*588 In all cases not provided for in Article 814, the following verdicts are responsive:
(1) Guilty;
(2) Guilty of a lesser and included grade of the offense even though the offense charged is a felony, and the lesser offense a misdemeanor; or
(3) Not Guilty.

. We note that even if the crime of domestic abuse battery (which has penalties different from that of simple battery) did not exist as a separate statute, one could still be prosecuted for simple battery for the identical acts complained of in the incident.

. Subsection B(2) is now subsection B(4) pursuant to La. Acts 2014, No. 194 § 1.

. We pretermit a discussion of whether the law would apply to two individuals of the same sex. See Costanza v. Caldwell, 14-2090 (La.7/7/15), 167 So.3d 619, and Obergefell v. Hodges, - U.S. -, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015)

.This court has previously discussed the part of La. R.S. 14:35.3 defining "household member” as “any person of the opposite sex presently living in the same residence or living in the same residence within five years of the occurrence of the domestic abuse battery with the defendant as a spouse, whether married'or not,” as requiring both be "presently living in the same residence” as well as "living in the same residence within five years,” and having been living "as spouse[s], whether married or not." See State in Interest of J.E., 14-0850, p. 5 (La.App. 4 Cir. 2/25/15), 160 So.3d 1065, 1068.
Louisiana does not have common law marriages, choosing to address the concept as open concubinage.

. La. R.S. 1:4 states: "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursing its spirit.”

. Including lengthy flings.

. We note that the concept of "living” together is different from "staying” together. See La. R.S. 14:35.3 B(2) [now La. R.S. 14:35.3 B(4) ].

. La. R.S. 14:35.3 is very poorly crafted. A meaningful revision of the law by the legislature is strongly suggested.

. This is discovered further infra.

. We find no merit to the state’s argument that Mr. Davis failed to designate as an .assignment of error the claim that his counsel should not have cross-examined Ms. Leonard, citing La.C.Cr.P. art. 920 (scope of appellate review limited to errors designated in the assignment of errors and patent errors).

. The court recognizes that if evidence of the parties being "household members” had been presented by the state, Mr. Davis would be guilty of -domestic abuse battery; the state simply did not prove this essential element. Further, had he been found guilty of domestic abüse battery, he would also be guilty of “domestic abuse child endangerment,” La. R.S. 14:35.3 I, considering that Ms. Leonard was holding their infant baby at the time of the altercation and thus, wás present at the residence when the battery took place.

.This supports the concept that the state is free, within its prosecutorial discretion, to charge a defendant with the most serious crime possible on the facts known at the time the bill of information is filed or the indictment obtained.
We further note that to interpret ArticÍe’778 in a way different from that which we hold herein would call into question every, conviction in every case where the defendant was convicted in a bench trial and the defendant’s counsel did not make a motion for acquittal at the close of the state’s case — creating an ineffective assistance of trial and/or appellate counsel claim for every defendant.
Further, it has the potential to cause all defense counsel as a trial strategy in a bench trial to never make a motion for acquittal at the close of the state’s case in order to set up a lock certain valid claim for ineffective assistance of counsel if the defendant is convicted on the specific offense charged.
Finally, it would encourage a defendant to waive his right to a trial by jury so that he might set up the situation where he must be found guilty of the precise offense charged in the bill of information or indictment or acquitted entirely without the possibility of being found guilty of a lesser included offense.
Such was never thé legislative - intent in enacting Article 778 or the intent of the Louisiana Supreme Court when deciding State ex rel. Robinson v. State, 367 So.2d 360 (La.1979) and State v. Davenport, 13—1859 (La.5/7/14), 147 So.3d 137, both discussed infra.

. We find that domestic abuse battery and simple battery are lesser included offense of the crime of domestic abuse battery.involving strangulation for purposes of La.C.Cr.P. art 815 because elements of both lesser offenses are needéd to prove domestic abuse battery involving strangulation; living together as husband and wife is an additional element of the domestic abuse battery crimes. Thus the possible - verdicts to a .charge of domestic abuse battery involving strangulation are guilty as charged, guilty , of domestic abuse battery, guilty of simple battery, and not guilty. See La.C.Cr.P. art 814 A(17).

. La.C.Cr.P. art. 821 provides:
A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.
*598 B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.
D. If a post verdict judgment of acquittal is granted or if a verdict is modified, the state may seek review by invoking the supervisory jurisdiction of or by appealing to the appropriate appellate court.
E. If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.